KQED, INC., et al., Plaintiffs-Appellees,

v.

Thomas L. HOUCHINS, Individually and in his official capacity as Sheriff of Alameda County, Defendant-Appellant.

No. 75–3643.

United States Court of Appeals, Ninth Circuit.

Nov. 1, 1976.

Rehearing and Rehearing In Banc Denied Dec. 22, 1976.

Kelvin H. Booty, Jr. (argued), of County Counsel, Oakland, Cal., for defendant-appellant.

William Bennett Turner (argued), of San Francisco, Cal., for plaintiffs-appellees.

Before DUNIWAY and HUFSTEDLER, Circuit Judges, and PREGERSON,* District Judge.

PREGERSON, District Judge:

This is an appeal from the trial court's issuance of a preliminary injunction restraining appellant, the Sheriff of Alameda County, California, from depriving appellees of their First and Fourteenth Amendment rights by "excluding as a matter of general policy . . . responsible representatives of the news media from the Alameda County Jail facilities at Santa Rita, including the Greystone portion thereof. . . ."[1] To allow "full and accurate coverage" of jail conditions, the preliminary injunction requires that the reporters be given access to Santa Rita "at reasonable times and hours," and that they be allowed to use photographic and sound equipment and to interview inmates. The specific method of implementing media access was left to the Sheriff's determination, and the Sheriff was given discretion to exclude the media when jail tensions made such access dangerous. The question presented on appeal is whether the terms of this preliminary injunction, entered after a full evidentiary hearing, constitute an abuse of the trial court's discretion.

[1] Clearly, the First Amendment grants the news media a constitutionally protected right to gather news. See Branz-

burg v. Hayes, 408 U.S. 665, 681–707, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), Pell v. Procunier, 417 U.S. 817, 833, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). This right is indispensable in preserving the news media as a major source of information for the public, particularly when the information sought concerns governmental institutions, including prisons. See Mills v. Alabama, 384 U.S. 214, 219, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966). The conditions of our nation's prisons "are a matter that is both newsworthy and of great public importance." Pell v. Procunier, 417 U.S. at 830, n.7, 94 S.Ct. at 2808.

The parties, however, dispute whether the scope of this news-gathering right encompasses the kind of access to Santa Rita Jail granted the news media by the preliminary injunction. Appellant relies on the Supreme Court's observation that "newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public."[2] Pell v. Procunier, supra, 417 U.S. at 834, 94 S.Ct. at 2810. On the basis of this statement, appellant argues that this preliminary injunction is an abuse of discretion because it permits reporters to view Santa Rita Jail and communicate with its inmates in ways denied the public during scheduled monthly tours of the facility.

■ The above-quoted language from Pell v. Procunier simply states that the news media's constitutional right of access to prisons or their inmates is co-extensive

---

* The Honorable Harry Pregerson, United States District Court Judge for the Central District of California, sitting by designation.

1. Brenneman v. Madigan, 343 F.Supp. 128, 133 (N.D.Cal.1972) described conditions at the Greystone building at the Santa Rita facility as "truly deplorable." The district judge held that the "shocking and debasing conditions which prevailed there constituted cruel and unusual punishment for man or beast as a matter of law."

2. The Supreme Court found that the regulation limiting press access in Pell v. Procunier was "not part of an attempt by the State to conceal the conditions in its prisons or to frustrate the press' investigation and reporting of those conditions." 417 U.S. at 830, 94 S.Ct. at 2808.

The Court observed: "Indeed, the record demonstrates that, under current corrections policy, both the press and the general public are accorded full opportunities to observe prison conditions." Id. In contrast, the Santa Rita Jail was completely closed to both the news media and the public prior to the filing of the present suit. After suit was filed, appellant inaugurated a program of monthly public tours of Santa Rita. Appellees presented evidence that these tours were limited to 25 people, booked months in advance, prohibited use of cameras or sound equipment, prohibited conversations with inmates, and omitted views of many parts of the jail, including the notorious Greystone Building.

with the public's right. Implicit in the trial court's memorandum granting the preliminary injunctions is the finding that the First Amendment rights of both the public and the news media were infringed by appellant's restrictive policy. Although the memorandum does not explicitly mention the public's rights, the trial court applied the proper test to determine whether these rights were infringed: a governmental restriction on First Amendment rights can be upheld only if the restriction furthers an important or substantial governmental interest unrelated to suppressing speech and the restriction is the least drastic means of furthering that governmental interest. *See United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The preliminary injunction, while protecting First Amendment rights, also satisfies the governmental interests in security of the jail and privacy of inmates. The Sheriff can exclude media access when jail security is threatened, make reasonable time, place, and manner restrictions, and develop appropriate administrative regulations that require searches of reporters, identification of press representatives, and consent from inmates for interviews and photographs.

■ Having determined that appellant's restrictive policy was an infringement of constitutional rights, the court did not err by issuing an injunction that, on its face, grants greater prison access to the news media than the access accorded the public on monthly guided tours of the facility. *Pell v. Procunier* does not stand for the proposition that the correlative constitu-

tional rights of the public and the news media to visit a prison must be implemented identically. The access needs of the news media and the public differ. Media access, on reasonable notice, may be desirable in the wake of a newsworthy event, while the interest of the public in observing jail conditions may be satisfied by formal, scheduled tours. Moreover, the administrative problems inherent in public and media access differ. A large public tour group creates a greater security threat and requires the use of more jail personnel to supervise the tour, while a single reporter, known to jail officials, should cause minimal, if any, interference to jail routine. Although both groups have an equal constitutional right of access to jails, because of differing needs and administrative problems, common sense mandates that the implementation of those correlative rights not be identical.

■ In the circumstances of this case, we cannot say that the trial court's issuance of the preliminary injunction was an abuse of discretion. Its order granting the preliminary injunction is therefore affirmed.

To determine the questions of infringement of the correlative rights of the public and the media and the means by which these rights are to be implemented, the trial court should consider the kind of access accorded the news media and the public in the California state prison system, as discussed in *Pell v. Procunier,* and the access accorded by the federal prison system as set forth in Policy Statement No. 1220.1B, a copy of which is attached as Appendix A.

---

APPENDIX A

FEDERAL PRISON SYSTEM

WASHINGTON, D. C. 20534

POLICY STATEMENT

NUMBER
1220.1B

SUBJECT: CONTACTS WITH NEWS MEDIA

DATE
7/1/76

---

1. PURPOSE. To establish, for a trial period of July 1—December 31, 1976, the policy of the Bureau of Prisons with respect to the news media.

2. POLICY. The Bureau of Prisons recognizes the desirability of establishing a policy that affords the public greater access to news about its operations. The policy is not

designed to provide publicity for inmates or special privileges for the news media, but rather to insure a better informed public. The correspondence and interviews, in a prison setting, must be regulated to insure the orderly and safe operation of the institution.

3. DIRECTIVE AFFECTED. Policy Statements 1220.1A and 1220.6/7300.96 are superseded by this Policy Statement.

4. PROCEDURE.

a. *Application.*

(1) For the purposes of this policy statement representatives of news media shall be defined as the following:

Persons who are primarily employed in the business of gathering or reporting news for (a) a newspaper qualifying as a general circulation newspaper in the community to which it publishes, (b) news magazines having a national circulation being sold by newsstands to the general public and by mail circulation, (c) national or international news services, (d) radio and television news programs of stations holding Federal Communication Commission Licenses.

Persons currently confined as prison inmates may not be employed or used as reporters under this policy statement.

A newspaper is one of "general circulation" if it circulates among the general public and if it publishes news of a general character and of general interest. A key test to determine whether a newspaper qualifies as a

Page 2
1220.1B
7/1/76

"general circulation" newspaper is to determine whether the paper qualifies for the purpose of publishing legal notices in the community in which it is located or the area to which it distributes. It is generally held that for a newspaper to be considered in law a newspaper of general circulation, and so be qualified to publish legal notices, it must contain items of general interest to the public such as

news of political, religious, commercial, or social affairs.

(2) Interviews by reporters and others not included in 4a(1), may be permitted only by special arrangement and with approval of the Warden.

(3) These regulations apply to all inmates in Federal institutions. When an inmate is confined in any non-Federal facility the local or state facility rules and regulations will govern.

b. *Institution Visits.*

(1) Representatives of the news and other media are encouraged to visit Bureau institutions for the purpose of preparing reports about institutional facilities, programs and activities. Media representatives shall make advance appointments for visits. During an institutional emergency, and for a reasonable time thereafter, the Warden may suspend all such media visits.

(2) When media representatives visit institutions, photographs of programs and activities may be taken, and media representatives may meet with groups of inmates engaged in authorized programs and activities. Inmates have the right not to be photographed, (still, movie or video), and not to have their voices recorded by the media. Visiting representatives shall be required to obtain permission before photographing or recording the voices of inmates participating in authorized programs and activities and shall be advised that use of names, identifiable photos of inmates, and voice recordings are not encouraged, but if taken or made releases must be signed by the inmates and placed in their respective files.

(3) The Bureau of Prisons has no objection to visits by news media representatives to schools or business establishments which employ offenders in community programs for the purpose of viewing offenders in community programs. It is the responsibility of the media

Page 3
1220.1B
7/1/76

representatives to obtain permission of the school or employer in advance. The rules outlined in paragraph (2) above apply to the community situation.

c. *Correspondence.*

(1) An inmate may write to representatives, specified by name or title, of the news media or other publications. Correspondence to a newsman may be sent through the Prisoners Mail Box, which provides for unopened correspondence. All properly identified and labeled correspondence to qualifying representatives of the news media shall be forwarded directly, promptly, sealed and without inspection. If there is doubt at to whether a representative qualifies, the institution should contact the Bureau's public information officer in the Central Office.

(2) Representatives of the news media or other publications may initiate correspondence with a particular inmate. Incoming correspondence from the news media or other publications will be inspected for contraband, and for content which is likely to promote illegal activity, or conduct contrary to Bureau regulations. A rejected letter will be returned to the author, with a brief explanation for the rejection. The author will also be notified that he or she may protest the rejection, and the complaint will be referred to an official other than the individual who originally disapproved the correspondence for review.

(3) The inmate may not receive any compensation, nor anything of value, for correspondence or interviews with the news media as defined in paragraph 4a(1).

(4) A transmittal letter, similar to the attached sample, will be attached to the outgoing Prisoners Mail Box letter, and the properly labeled mail will be sent each working day, at government expense.

d. *Personal Interviews.*

(1) Either an inmate or a representative of the news media may initiate a request for a personal interview at an institution.

*As a prerequisite to the interview, the inmate must authorize the institution staff to respond to comments made in the interview and to release information to the news media relative to the inmate's comments.*

Page 4
1220.1B
7/1/76

(2) If the news media representative wishes to conduct a personal interview at the institution, and makes a written request directed to the Chief Executive Officer of the institution for authorization, it will be permitted subject to the conditions of this policy statement.

(3) Representatives of the news media may request to interview a particular inmate. The request shall be made in writing to the Warden of the institution within a reasonable period of time—normally within 24 to 48 hours—prior to the requested time for the interview.

(4) The inmate will be notified by the institution of the interview request and must agree to be interviewed by signing a consent form (attachment 3) before the request will be considered. The written consent or denial shall, in all cases, be placed in the inmate's central file.

(5) A request will normally be approved or disapproved within 24 to 48 hours. An interview may be disapproved for any of the following reasons, provided that the Warden documents any such disapproval:

(a) The news media representative, or the news organization which he or she represents, does not agree to the conditions established by this policy or has, in the past, failed to abide by the required conditions.

(b) The inmate is physically or mentally unable to participate. This shall be supported by a medical officer's statement (a psychologist may be used to verify mental incapacity) to be placed in the inmate's record, substantiating the reason for disapproval.

(c) The inmate is a juvenile (under 18) and written consent has not been obtained from his parent or guardian.

If the juvenile inmate's parents or guardians are not known or their addresses are unknown, the Warden of the institution shall notify the representative of the news media of the inmate's statute as a juvenile, and shall then consider the authorization after placing a copy of the inmate's written consent in his file.

(d) Such interview, in the opinion of the Warden of the institution, would endanger the health or

Page 5
1220.1B
7/1/76

safety of the interviewer, or would probably cause serious unrest or disturb the good order of the institution.

(e) The inmate is involved in a pending court action and the court having jurisdiction over the matter has issued a "gag rule." In the case of unconvicted persons (including competency commitments under 18 U.S.C. 4244 and 4246) held in Federal institutions, interviews should not be authorized until there is clearance with the court having jurisdiction, ordinarily through the U.S. Attorney's office. In some districts, there may be a standing authorization for interviews, in the absence of individual "gag orders," but in other districts, all pretrial inmates may need to be cleared upon request for interviews.

(f) The inmate is a "protection" case and revelation of his or her whereabouts would endanger his or her safety.

(6) Interviews will be held in the institution visiting room during normal weekday business hours unless the Warden of the institution determines that another location is more suitable. Interviews will be limited to two one-hour interviews per inmate per month. If the Warden determines that interviews are imposing a serious drain on the staff or use of the facilities, interview time for the entire institution may be limited. Such a limit shall be established on an institution-by-institu-

tion basis and shall be made a part of the institution's policy covering this subject. Due to the special security, custodial, and supervisory requirements necessitated by such interviews, an inmate in segregation, restricted, holdover, or hospital status may be limited to a one-hour interview per month.

(7) Interviews will not be subject to auditory monitoring or supervision.

(8) Photographs or audio or video recordings may be taken during interviews in accordance with the conditions outlined in 4b(2). If the Warden of the institution determines that the presence of video, film, or audio equipment or personnel would be likely to create a disruption within the institution, such equipment or personnel may be limited. For example, in the case of inter-

Page 6
1220.1B
7/1/76

views conducted in visiting rooms which are frequently crowded, or in visiting rooms of maximum security institutions, the Warden may limit the equipment to hand held cameras or recorders.

(9) If in conjunction with an interview of an individual inmate the news media representative wishes to tour the institution and take photographs or make recordings of other inmates, he or she must comply with the procedures set out in 4b(2)

e. *Press Pools.*

Whenever the frequency of requests for interviews and visits reaches a volume as is determined by the Warden to warrant limitations, a press pool may be established. In this situation, all news media representatives having requested interviews or visits which have not been conducted shall be notified that selected representatives shall be admitted to the institution to conduct interviews under such guidelines as the Warden establishes. All material generated from such a press pool shall be made available to all news media, without right of first publication or broadcast. The press pool shall be composed of no more than one repre-

sentative from each of the following groups present. The representatives shall be selected by the members of the respective groups.

(1) The national and international news services;

(2) The television and radio networks and outlets;

(3) The news magazines and newspapers; and,

(4) All media in the local community where the institution is located.

f. *Release of Information.*

(1) Announcements of unusual incidents shall be made to local news media as promptly as possible by the Warden or by a staff member designated by him. The institution will prepare a statement for release to the media, briefly stating the facts. The text of such messages shall be transmitted to the Bureau as part of the reports required on the incidents to which they relate. If it can reasonably be assumed that the wire services or the Washington press will make inquiry at the Central Office, the text should be communicated to the Central Office by telephone.

(2) Announcements related to Bureau Policy, such as changes in institutional missions, type of inmate popula-

Page 7
1220.1B
7/1/76

tion, as well as announcements of changes in executive personnel, will be made by the Central Office. Press inquiries on such subjects shall be referred to the public information officer of the Bureau of Prisons in Washington.

(3) Information about an inmate that is a matter of public record will be provided by the Warden or his representative to representatives of the news media upon request. Such information shall be limited to the inmate's name, register number, place of incarceration (provided it is not confidential for protection), age, race, offense for which convicted, court where sentenced, length of sentence, date of sentencing, date of arrival, past movements via transfers or writs, general institutional assignments, parole eligibility date, and date of expiration of sentence. Other contents of inmate files are confidential. Requests for additional information about individual inmates shall be referred to the Central Office. The Warden of each institution, or his designated representative, shall be solely responsible for contacts with the press. Other staff members shall refer all press inquiries to the Warden or his designee.

g. *Special Conditions.*

(1) Authorization for institution visits or interviews shall be conditioned upon the news media representative certifying that he or she is familiar with the rules and regulations governing his conduct during interviews and visits and that he or she agrees to comply with them. Certification shall be done by use of an affidavit similar to the attached.

(2) The Bureau has a responsibility to protect the rights of all inmates and members of its staff. It is expected, as a condition for authorizing interviews and making facilities available to conduct an interview, that the news media representative will make a reasonable attempt to verify any allegations regarding an inmate, staff member, or institution and will provide an opportunity to respond to any allegation which might be published or broadcast prior to such distribution.

(3) *Representatives of the news media will collect information only from the primary source. The Bureau considers it highly improper and a violation of this policy to obtain and use personal information from one inmate about another inmate who refuses to be interviewed.*

Page 8
1220.1B
7/1/76

(4) While in an institution, representatives of the news media are subject to applicable rules and regulations of the institution. Discussions or comments regarding applicability of any rule, regula-

tion or order should be conducted with the administrator of the institution, or person specifically designated by him.

h. *Interpretations.*

Any question as to the meaning or application of this policy statement will be resolved by the Director of the Bureau of Prisons.

5. ACTION. Institution Policy Statements relating to correspondence and interviews with the news media shall be amended promptly to be in compliance with this issuance. Any modification of this policy statement must be submitted to the Assistant Director, Correctional Programs Division, within 30 days from receipt of this policy statement.

/s/ Norman A. Carlson
NORMAN A. CARLSON
Director, Bureau of Prisons
Commissioner, Federal Prison Industries, Inc.

BP-DIR-12
July, 1976

Attachment 1
1220.1B
7/1/76

## AFFIDAVIT

State of ....................................)     Inmate's Name ...................................

) ss.:

County of ...............................)     Inmate's Number ...............................

I, ..............................................................................................., after first being duly sworn, do hereby state that I am primarily employed in the business of gathering or reporting news for a newspaper qualifying as a general circulation newspaper in the community to which it publishes; or a magazine or periodical having a national circulation; or national or international news services; or radio or television news programs holding Federal Communications Commission license.

My employer is (business name) ................................................................, my immediate superior is .............................................................., who may be reached at (phone) ..........................................

I have familiarized myself with Policy Statement 1220.1B governing my conduct during interviews and visits within the institution and agree to comply fully with them.

When allegations are made by the inmate interviewed against the Department of Justice or the Bureau of Prisons, or any staff member, or against another inmate, I agree to give the affected party a reasonable opportunity to respond.

I hereby fully and completely waive my personal right to be free from search of my person or property so long as I remain within the boundaries of the institution grounds.

I agree to provide no compensation, either direct or indirect, to the inmate or his or her family for any interview or correspondence. I further agree to respect the rights of privacy of all inmates and to obtain a release from any inmate before any photos or recordings are utilized or personal information derived

from any interview or correspondence is used in any publication or broadcast.

I recognize a visit to a prison presents certain hazards, and I agree to assume all ordinary and usual risks to my personal safety inherent in a visit to an institution of this type.

_____
(Signature)

Subscribed and sworn to before me this _____
day of _____19_____.

_____
NOTARY PUBLIC

Copy to: media representative
Original to: inmate's file

Attachment 2
BP-DIR-13                                    1220.1B
July, 1976                                    7/1/76

(SAMPLE TRANSMITTAL LETTER)

UNITED STATES PENITENTIARY

Leavenworth, Kansas

_____
Date

The attached letter was placed in our Prisoners Mail Box for forwarding to you. The letter has been neither opened nor inspected. If the writer raises a problem over which this institution or the Bureau of Prisons has jurisdiction, you may wish to write to me or to the Director, Bureau of Prisons, Department of Justice, Washington, D.C. 20534.

You may write back to the inmate, and ask him questions. Your letter will be inspected for contraband, and for any content which would incite illegal conduct or conduct which violates institution rules. Also, personal interviews are permissible under certain conditions.

The Bureau of Prisons encourages the press to visit institutions, and learn about correctional programs and activities. If you wish to do this, please contact me.

Inmates may not receive any compensation, nor anything of value, for correspondence or interviews with the news media. If the person writing you names another inmate or a staff member in his correspondence, we request that you advise us of that fact before its publication. We will provide background information and specific comments whenever possible.

If the writer encloses, for forwarding, correspondence addressed to another addressee, please return the enclosure to me, or to the Director.

Non-compliance with the above must result in a withdrawal of such access. All materials sent to or received from an inmate not authorized herein, or by Bureau policy, shall constitute contraband within the meaning of 18 U.S.C. 1791, which provides a sentence of up to 10 years. This includes the introduction into, or taking from, any correctional institution anything whatsoever contrary to any rule or regulation.

WARDEN

BP-DIR-14                                        Attachment 3
July, 1976                                       Page 1
                                                           1220.1B

U. S. BUREAU OF PRISONS
Date  .........................................................

Inmate's name and number (print)  .......................................................

Name of Institution  .........................................................

Name of news media representative  .......................................................

Name of media represented  .......................................................

Address of media represented  .......................................................

I, the above-named inmate, do hereby freely give permission to the above-named news media representative to interview me on or about (date)  ......................................... and I do hereby authorize the news media represented by this person to use any information gathered about me during this interview for any legitimate purpose. I further authorize the Bureau of Prisons and the Department of Justice, and their authorized representatives, to release to representatives of the news media any documents or information relating to allegations or comments made by me in this interview.

Inmate's signature  .........................................................

Witness  ......................................... Title  .........................

I, the above-named inmate, refuse permission to the above-named news media representative to interview me.

Inmate's signature  .........................................................

Witness  ......................................... Title  .........................

*   *   *   *

I, the above-named inmate, do further freely give permission to the above-named news media representative to make recordings of my voice during this interview and to take photos of me (still, movie, or video) and I do hereby authorize the use of such

pictures or recording by the news media represented by this person for any legitimate purpose.

Inmate's signature ...................................................................

Witness ................................................................... Title ...........................

Original to: inmate's file
Copy to: media representative

---

DUNIWAY, Circuit Judge (concurring):

I concur, but I confess to having serious doubts about the result, not because I think that it is wrong in principle, but because I have great difficulties in reconciling the result with the decisions in *Pell v. Procunier,* 1974, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 and *Saxbe v. Washington Post Co.,* 1974, 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514. I think it clear beyond the possibility of argument that the preliminary injunction from which the appeal is taken grants to KQED and other media greater access to the Santa Rita Jail than is granted to the public.

I cannot reconcile this result with the decisions in *Pell, supra,* and *Washington Post, supra.* As I read these cases, they stand for this proposition:

" . . . Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded." *Branzburg v. Hayes, supra,* at 684–685, 94 S.Ct. at 2658. Similarly, newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public.

. . . The Constitution does not, however, require government to accord the press special access to information not shared by members of the public generally. It is one thing to say that a journalist is free to seek out sources of information not available to members of the general public, that he is entitled to some constitutional protection of the confidentiality of such sources, cf. *Branzburg v. Hayes, supra,* and that the government cannot restrain the publication of news emanating from such sources. Cf. *New York Times Co. v. United States, supra* [403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822]. It is quite another thing to suggest that the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally. That proposition finds no support in the words of the Constitution or in any decision of this Court. Accordingly, since § 405.071 does not deny the press access to sources of information available to members of the general public, we hold that it does not abridge the protection that the First and Fourteenth Amendments guarantee. 417 U.S. at 834–35, 94 S.Ct. at 2810.

*See also Saxbe, supra,* 417 U.S. at 850, 94 S.Ct. 2811.

I happen to believe that, as to most issues of public importance, and assuming that one accepts the media-created notion that there is such an animal as a constitutionally protected "public's right to know" and further assuming that the media somehow embody that "right," then the media have a protected preferred right to access to information about the public's business. This is based on the proposition that, in our modern, urban, overpopulated, complex and somewhat intimidating and alienating society, only the media, as distinguished from the submerged, often alienated, and often frightened, individual, can be counted on to dig out and disseminate the facts about the public's business. Witness "Watergate" and its remarkable consequences.

But I cannot reconcile these notions with the express basis for the decisions in *Pell, supra,* and in *Washington Post, supra.* I would like to assume that those decisions

are not to be taken literally, but I find nothing in them to support that assumption. Yet I am dubious about the result that they seem to require. It seems to me to be obvious that regulations governing media access to a jail, assuming that the media have a right, along with the public, to such access, must differ from regulations governing access by the public at large. It is one thing to say that representatives of the media, who are not numerous and who can readily be screened, should be able to interview inmates, take pictures, etc., and quite another thing to say that any one of the several million inhabitants of the San Francisco Bay Area, or any one of the million or so inhabitants of Alameda County, should have the same rights. The administrative problems posed by the two are obviously different, and the law ought to recognize the differences. But as I read *Pell, supra,* and *Washington Post, supra,* those cases, far from recognizing these differences, expressly disregard them. Accordingly, I must express doubt, not because I think that I ought to, but because I think that the Supreme Court's decisions require it.

HUFSTEDLER, Circuit Judge (concurring specially):

The holdings of *Pell v. Procunier* (1974) 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495, and *Saxbe v. Washington Post Co.* (1974) 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514, are not directly involved on this appeal. The thorny question is the interpretation of the broad statement in *Pell* that "newsmen have no constitutional right of access to prisons or their inmates beyond that afforded to the general public."

I do not read *Pell* to mean that regulations that are reasonable in controlling access to prisons and prisoners by the general public will always pass the First Amendment test when the same regulations are imposed on the news media. In context, as I read *Pell* and *Saxbe,* the rationale means that the First Amendment does not give news media any special right of access to prisons or to prisoners and none that is not reasonably necessary to serve the public interest in being informed about prisons

and prisoners. To the extent that a private person would be properly barred from interviewing prisoners or from entering portions of the prison that are private, the news media can also be barred. Neither *Pell* nor *Saxbe* involved the application of regulations imposing the same standards on news media personnel and members of the general public; in both instances the press had greater latitude than the general public. The Court did not purport to address the question whether news media could be confined constitutionally to regulations controlling access to prisons or to prisoners that govern group tours by the general public.

Although I do not disagree with Judge Pregerson's statement that, under *Pell* and *Saxbe,* "the news media's constitutional right of access to prisons or their inmates is co-extensive with the public's right," I do not believe that the statement is helpful in absence of any description of what the public's right is or how the right is to be vindicated.

Two separate, but related questions are involved: (1) What kind of information about prisons and prisoners does the public have a right to know? Or, to put the question differently, from what kind of information about prisons and prisoners should the public be excluded? (2) What kinds of limitations can be imposed on the public and on the news media upon the means by which the information to which the public is entitled can be gathered?

The Court in *Pell* recognized that conditions in our Nation's prisons are matters of great public importance about which the public should be informed. To that end, the public's right to knowledge about the conditions of prisons and prisoners is very extensive. Information should not be curtailed except to the extent reasonably necessary to shield the prisoners' small store of personal privacy, to protect the physical security of the prison, the prisoners, and the prison personnel, and to allow prison personnel enough privacy and administrative control to permit them effectively to perform their duties. As the eyes and ears of the public, newsmen are entitled to see and

to hear everything within the institution about which the general public is entitled to be informed. The public is not entitled to know everything that the inmates say and do or everything that goes on in the prison. For instance, the public is not entitled to know the contents of the conversations between an inmate and his religious adviser, his lawyer, or his wife, nor to have a transcript of an executive session of prison administrators, nor to know the combination of prison locks. The interests in personal privacy, prison security and discipline, and effective management of the institution in these respects outweigh the public's general interest in being informed about prison conditions. News media, as surrogates for the public, cannot claim any constitutional entitlement to acquire information from which the general public is appropriately excluded.

Assuming that the information to be gathered is of a kind that the public is entitled to know, the question then is focused on the means by which the information is to be acquired. Here, we are concerned solely with gathering information inside a prison. Prisons, like other public institutions, have some areas from which the public, whether represented by one private citizen or by a member of the news media, must be barred at least some of the time. A prison warden could no more do his job if his private office was always on public display, than could a judge if he were obliged to hold perpetual open house in his chambers. In addition, however, prisons present special problems that do not have exact counterparts in other public institutions where security, discipline, and potential violence are not as omnipresent. Regulations controlling access to prisons and to prisoners, of course, can and should take these special circumstances into account. However, it does not follow that regulations that are reasonable under the circumstances as applied to touring groups of the public are also reasonable as applied to news media personnel.

Guided public tours and news media access do not serve identical purposes nor do they involve identical practical problems. Both kinds of visits are methods of providing to the public information about the prison and prisoners. The media mission, however, is different in degree, though not in kind, from the display to a tour group. The newsmen's function is to gather, to collate, and to transmit to a wide public audience all of the information which the public is entitled to know about prison conditions. A private tour group might have similar or better ability to gather information than newsmen, but it would be rare that the combination of training and the means of transmission enjoyed by the news media would be found in a tour group. An adequate view of prison conditions is unlikely if the observer is confined to the areas of prisons and the times of visitation that are appropriate for conducted tours. As Judge Duniway points out, the administrative problems posed by newsmen and tour groups are very different. For instance, the public is entitled to know about the kind of food that is served and the circumstances under which it is prepared. It would be very difficult to guide a tour group through all of the steps of service and preparation without serious disruption of the service and the kitchen, but a small crew of media personnel could adequately observe and report the proceedings without undue interference. Moreover, it should be obvious that a candid view of prisons and prison life is not possible if both the news media and the general public are limited to white glove inspections at hours and on days scheduled by prison administrators for their own convenience.

I agree with Judge Pregerson that the preliminary injunction issued by the district court is consonant with the teaching of *Pell* and *Saxbe*.