OTTAWAY NEWSPAPERS, INC. *vs.* APPEALS COURT & another[1];
BASS RIVER SAVINGS BANK, intervener.

Suffolk.    September 17, 1976. — May 11, 1977.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, & WILKINS, JJ.

*Supreme Judicial Court,* Superintendence of inferior courts.    *Public
Record.    Constitutional Law,* Public trial.    *Practice, Civil,* Public
trial, Impoundment order.    *Words,* "Public record."

Reports of a bank examination compiled by the Commissioner of Banks
pursuant to G. L. c. 167, § 2, were exempted from disclosure under
c. 4, § 7, Twenty-sixth [545]; after the reports were made part of the
court files in a Superior Court action, they were outside the scope
of the inspection provisions of c. 66, § 10 [545-546].
There was no abuse of discretion in ordering impoundment of the court
record in an action by a bank to enjoin the Commissioner of Banks
from proceeding against it under G. L. c. 167, § 5. [546-547]
In the circumstances, impoundment of the court record in an action by
a bank to enjoin the Commissioner of Banks from proceeding against
it under G. L. c. 167, § 5, was not an unconstitutional infringement
of the free press guaranty. [547-550]
A newspaper's action to vacate an order impounding the court record
in a proceeding by a bank to enjoin the Commissioner of Banks
from seeking the removal of bank officers under G. L. c. 167, § 5, was
not rendered moot by the bank's withdrawal of its action where the
record remained impounded and where the question of impoundment
in comparable situations was one capable of repetition, yet evading
review. [550]
A stranger to an action in which an impoundment order has been en-
tered may seek relief from the order by bringing a civil action in the
court which issued it, joining the clerk of that court in his official
capacity and the parties to the action. [550-552]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on May 24, 1976.

The case was heard by *Liacos, J.,* on motions to dismiss.

*William H. Carey* for the plaintiff.

*Thomas R. Kiley,* Assistant Attorney General (*Louis A.
Rizoli,* Assistant Attorney General, with him) for the Ap-
peals Court & another.

_____
[1] Clerk of the Appeals Court.

*Peter M. Lauriat (James Roosevelt, Jr.,* with him) for Bass River Savings Bank, intervener.

*Thomas H. Walsh, Jr., & James F. McHugh,* for The Reporters Committee for Freedom of the Press, amicus curiae, submitted a brief.

*James C. Heigham,* for Massachusetts Newspaper Publishers Association, amicus curiae, submitted a brief.

KAPLAN, J.    This was an action under the "superintendency" statute, G. L. c. 211, § 3,[2] brought in the Supreme Judicial Court for Suffolk County by Ottaway Newspapers, Inc., publisher of the Cape Cod Times (newspaper), against the Appeals Court and its clerk, in which Bass River Savings Bank (bank) was admitted as an intervener. The newspaper sought a judgment vacating an impoundment order that had been granted by a single justice of the Appeals Court in the course of a separate litigation originating in the Superior Court between the bank and the Commissioner of Banks of the Commonwealth (commissioner).[3] A single justice of our court, after considering in camera the pleadings supplemented by a statement of agreed facts incorporating the record in the separate action, and after hearing the parties and the intervener, granted motions to dismiss the action, thus refusing to lift the impoundment. The newspaper takes the present appeal to the full court from the judgment of dismissal.

1. For an understanding of the appeal a brief descrip-

[2] General Laws c. 211, § 3, as amended through St. 1973, c. 1114, § 44, provides in part: "The supreme judicial court shall have general superintendence of all courts of inferior jurisdiction to correct and prevent errors and abuses therein if no other remedy is expressly provided; and it may issue all writs and processes to such courts and to corporations and individuals which may be necessary to the furtherance of justice and to the regular execution of the laws."

[3] As will be seen, the original impoundment order was that issued by a judge of the Superior Court; two later orders by single justices of the Appeals Court and our court continued the impoundment. The superintendency action named the Appeals Court and the clerk as defendants presumably because the case was then lodged in that court.

tion is needed of the origin and nature of the separate but related litigation. In our recital we shall touch glancingly on the contents of papers still nominally impounded, but that will be where the information is now bland, or has become naturally available notwithstanding the impoundment order.

Some time before April 1, 1976, the commissioner reached the conclusion in her own mind that the bank, despite warnings, had engaged in unsound practices in respect to its commercial loans. (There was no claim that the management was otherwise improvident or that the bank was of dubious solvency or liquidity.) The remedy the commissioner sought was to displace the president and members of the board of investment of the bank, and to that end she commenced on April 1 to take the steps, looking to possible eventual removal of bank officers, prescribed by G. L. c. 167, § 5 (to be dealt with below in this opinion). The bank had some informal advance notice of what the commissioner intended to do. To halt the § 5 proceeding, the bank on the same day, April 1, filed an action against the commissioner in the Superior Court for Barnstable County. The papers filed in the action recounted the dealings between the bank and the commissioner over a period of time, exemplified by copies of pertinent parts of reports of examination of the bank by the commissioner's staff. As a basis for relief the bank asserted that the procedures provided by § 5 were invalid as applied because insufficiently protective of the bank officers charged with misjudgment, and thus unjustifiably harmful to the interests of the bank itself; there was a further claim that the commissioner had shown bias against the accused officers and the bank. An injunction was prayed against the commissioner's pursuit of the § 5 remedy. The bank's complaint was accompanied by its motion to impound the papers in the action; this the judge granted without objection on the part of the commissioner. Also granted was a temporary restraining order against the commissioner which on April 22 was continued as a preliminary injunction.

The commissioner applied to a single justice of this court on April 30 to review and vacate the preliminary injunction pursuant to G. L. c. 231, § 118 (temporary appellate relief from interlocutory orders). As the regular court of review of any final judgment to be entered in the bank's Superior Court action against the commissioner would be the Appeals Court, it was logical to transfer the § 118 application to the Appeals Court (see G. L. c. 211, § 4A), and that is what the single justice of this court did on May 3, having earlier, without objection, ordered the papers to be impounded. The application passed to a single justice of the Appeals Court and was heard by him on May 11.

In the meantime the newspaper had learned, and had published, that litigation was afoot between the bank and the commissioner regarding the commissioner's proposal to cause the removal of the bank personnel already mentioned. This was newsworthy since the bank, located in South Yarmouth, was a relatively large institution well known on Cape Cod, the area served by the newspaper published in Hyannis. The newspaper had also learned, and had published, that the record in the litigation was impounded. It asked the bank and the commissioner to move voluntarily to release the impoundment order, but the request was declined by both sides. Learning that the litigation had proceeded to the Appeals Court, the newspaper wrote to the Chief Justice of that court on May 11, requesting information about the case and permission to inspect the papers on file. In reply the Chief Justice wrote the next day that the papers had been impounded by order of a single justice of the Supreme Judicial Court. He confirmed that an application was pending in the Appeals Court. In fact, on May 14 a single justice of the Appeals Court vacated the preliminary injunction with an analytic memorandum holding that the bank could not demonstrate irreparable harm because the removal procedures of c. 167, § 5, obviated such injury. Again·without objection, this single justice by order continued the impoundment. (The bank made efforts, which need not be

described, to stay or secure review of the vacation of the preliminary injunction.)

With no access to the court files, the newspaper had little more than a guess about the facts underlying the controversy between the bank and the commissioner; and so, on May 24, it commenced the "superintendency" action against the Appeals Court and its clerk, first noted in this opinion, which ended on June 21, 1976, with a judgment of dismissal from which this appeal is taken.

The single justice of this court examined in camera, as have we, the impounded papers — the subjects of the three impoundment orders — which the newspaper desired to examine with a view to publication. Without setting out the details, we can say that the heart of the papers consisted of those parts of a number of reports of examination of the bank's operations, made on behalf of the commissioner pursuant to G. L. c. 167, § 2 (further considered below), which centered on the bank's commercial loans. There were particulars as to certain loans to specific borrowers, including some appraisals of properties. The practices and policies of the bank in this field were analyzed and criticized. The several reports contained conclusions and recommendations, and the last report stated the commissioner's purpose to see to the removal of the persons whom she supposed to be responsible for the alleged misjudgments involved (venality or dishonesty was not charged).

2. The newspaper's demand for disclosure is to be considered first in the setting of the provisions of the banking law already cited. Under G. L. c. 167, § 2, the commissioner makes periodic and special examinations and audits of the condition of banks in the department's charge (there is a procedure for appraisals of real estate securing bank loans).[4] With certain exceptions, the reports are for the confidential use of the bank and the commissioner and

---

[4] When the commissioner undertakes to appoint an appraiser, notice is given to the bank, which may also appoint an appraiser; both reports are then submitted to the commissioner on the same date.

are not to be shown to or inspected by others.[5] But "[n]othing herein contained shall be construed to prohibit the requiring of the production of such records, and information contained in the reports of such banks, before any court of this commonwealth ..., in any criminal or civil proceeding therein pending, affecting such bank, its officers, directors or employees." G. L. c. 167, § 2, as amended through St. 1975, c. 684, § 23B.

The procedure for removal of bank personnel is set out in G. L. c. 167, § 5. The commissioner, considering that an officer has conducted the business of the bank in an unsafe or unsound manner (among other stated causes), may send a statement of the facts to the executive officer and trustees, suggesting appropriate action by the bank. Within a period specified by the commissioner, the trustees hold a special meeting to consider the commissioner's statement. (In the instant case, such a meeting was set for April 1.) If the suggested action is not taken, the commissioner notifies the accused officer to appear and show cause why he should not be removed. A hearing is held before the commissioner, in the presence also of a board consisting of the State Treasurer, the Attorney General, and the Commissioner of Corporations and Taxation (or their representatives). On a finding that the officer is guilty of the delinquency charged, the commissioner may (in discretion) order him removed from office. This decision, however, may be reversed by the action of a majority of the board of State officials. The proceeding before the commissioner and the board is private, for it

[5] The records and information contained in the reports, other than information required by law to be published or open to inspection, "shall be open only to the inspection of the commissioner, his examiners and assistants, and such other officers of the commonwealth as may have occasion and authority to inspect them in the performance of their official duties." § 2, par. 3. "Copies of reports of such examinations of any bank shall be furnished to such bank for its use only and shall not be exhibited to any other person, organization or agency without the prior written approval of the commissioner of banks." But "such information, reports and statements relating to the institutions" as the commissioner "deems best" may be furnished to the chief national bank examiner and certain others. § 2, par. 4.

is provided that even when the officer is found guilty, the findings and order of removal shall not be disclosed beyond that officer and officials of the bank, except in a judicial proceeding, that is, an action by the officer to review the order, the standards for review being those of the State Administrative Procedure Act (G. L. c. 30A, § 14 [8]).[6]

3. In its pleading the newspaper attacked the impoundment order as applied to itself as a violation of the public records provisions of G. L. c. 66, § 10, which require the custodian of such records, as these are defined in G. L. c. 4, § 7, Twenty-sixth, to permit inspection on request by any person.[7] But as subparagraph (*a*) of that clause exempts records "specifically or by necessary implication exempted from disclosure by statute," the commissioner, as custodian, was by c. 167, § 2, relieved of any duty to disclose the reports of examination here involved to the newspaper. (In refusing the newspaper's request to inspect certain reports of examination of the bank, the commissioner in fact cited § 2.)

When the reports were made part of the court files in the Superior Court action, it might be said that the

---

[6] For the text of c. 167, § 5, see appendix. The statute is not singular. See the similar enactments: Conn. Rev. Gen. Stat. c. 636, § 36-25 (1977); Ill. Rev. Stat. c. 16½, § 148 (8) (1973); Ind. Code Ann. § 28-1-2-20 (Burns 1973); N.J. Stat. Ann. § 17:9A-249 (West 1963); N.Y. Banking Law § 41 (McKinney 1971); Ohio Rev. Code Ann. § 1127.06 (Baldwin 1975).

[7] General Laws c. 66, § 10 (*a*), as appearing in St. 1973, c. 1050, § 3, provides: "Every person having custody of any public records, as defined in clause twenty-sixth of section seven of chapter four, shall, at reasonable times and without unreasonable delay, permit them to be inspected and examined by any person, under his supervision, and shall furnish one copy thereof on payment of a reasonable fee."

General Laws c. 4, § 7, Twenty-sixth, as appearing in St. 1973, c. 1050, § 1, states: " 'Public records' shall mean all books, papers, maps, photographs, recorded tapes, financial statements, statistical tabulations, or other documentary materials or data, regardless of physical form or characteristics, made or received by any officer or employee of any agency, executive office, department, board, commission, bureau, division or authority of the commonwealth, or of any political subdivision thereof, or of any authority established by the general court to serve a public purpose, unless such materials or data fall within the following exemptions in that they are: . . . ."

custodianship changed and the commissioner's exemption under c. 4, § 7, Twenty-sixth, subparagraph (*a*), was no longer pertinent (and especially so in view of the provision in c. 167, § 2, about production in aid of court proceedings). Viewed as court records, however, the reports and, indeed, all else properly part of the court files were outside the range of the provisions of c. 66, § 10, regarding inspection. This is fairly clear from the text of c. 4, § 7, Twenty-sixth, itself,[8] and was earlier settled as a general proposition in *Sanford* v. *Boston Herald-Traveler Corp.*, 318 Mass. 156, 157 (1945), when the statutes were in different form.

4. The newspaper invokes the law and practice of the Commonwealth with respect to the open conduct of judicial proceedings. Here we acknowledge, and we affirm with emphasis, what Qua, C.J., called the "general principle of publicity." *Commonwealth* v. *Blondin*, 324 Mass. 564, 571 (1949), cert. denied, 339 U.S. 984 (1950). See *Cowley* v. *Pulsifer*, 137 Mass. 392, 394 (1884) (Holmes, J.); *United States* v. *Mitchell*, 551 F.2d 1252, 1259-1260 (D.C. Cir. 1976) (two to one decision), cert. granted sub nom. *Nixon* v. *Warner Communications, Inc.*, 430 U.S. 944 (1977). At the same time there are statutes which, for a variety of reasons that can be surmised, limit, or authorize limitation of access to court proceedings and official records.[9] These statutes do not preclude the exercise by judges of a sound discretion to impose reasonable cloture, including impoundment, in other cases when found necessary. See *Sanford* v. *Boston Herald-Traveler Corp., supra* at 158.

---

[8] See note 7 *supra.*

[9] See G. L. c. 94C, § 34 (sealing criminal records regarding possession of controlled substances); c. 119, § 65 (exclusion of public from juvenile sessions); c. 210, § 5C (sealing papers regarding adoptions); c. 220, § 13 (exclusion of minors as spectators from court room); c. 276, §§ 100A, 100B, 100C (sealing of various probation files with corresponding sealing of court records); c. 278, § 16A (exclusion of public from trial of certain sex offenses); c. 278, § 16B (exclusion of public from trial of crimes involving husband and wife). As illustrative of confidentiality in administrative fields, see c. 149, § 172; c. 151A, §§ 46, 64; G. L. c. 255C, § 6. Regarding confidentiality in the course of discovery in civil actions, see Mass. R. Civ. P. 26 (c) (5)-(8), 365 Mass. 772 (1974).

In the present situation we think the three judges who were faced successively with the problem could well have decided that the banking statutes, particularly c. 167, § 5, dealing with removal of bank officers, if not calling by explicit language for provisional impoundment of the court record, did so by implication or analogy. The Superior Court action was an attempt to forestall the administrative removal proceeding. If the papers basing the charge against the bank officers were disclosed publicly in that action, and the action failed — as, in the event, the decision of the single justice of the Appeals Court suggested it well might — then the administrative case would presumably go forward, but now there would be a distortion and frustration of the legislative purpose to keep that case private up to the point of possible judicial review of an administrative decision unfavorable to the bank officer. Without further embroidery of the point or discussion of the adjacent statutory material, it seems to us that the policy of § 5 supported the decisions taken by the judges to impound the court record, and all the more strongly because the Superior Court action had not gone beyond the stage of a preliminary injunction.

5. The newspaper takes the high road and urges that, regardless of the common or statutory law of the Commonwealth, impoundment in the circumstances of the case was unconstitutional as an infringement of the free press guaranty. The briefs of the newspaper and friends of the court discuss "prior restraint," invoking cases from *Near v. Minnesota,* 283 U.S. 697 (1931), to the recent "gag order" cases of *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539 (1976), and *Oklahoma Publishing Co.* v. *District Court in and for Okla. County, Okla.,* 430 U.S. 308 (1977). The press (like the rest of us) enjoys very extensive protection against attempts by the State to tell it what it may not publish. The gag order cases are illustrative of the proposition that only in the most extreme situations, if at all, may a State court constitutionally forbid a newspaper (or anyone else) to report or comment on happenings in and about proceedings which have been held in open court;

and a similar rule would apply to court files otherwise unrestricted. Such censorship is certainly in the category of prior restraint. See also *Cox Broadcasting Corp.* v. *Cohn,* 420 U.S. 469 (1975); *United States* v. *Dickinson,* 465 F.2d 496 (5th Cir. 1972).

Different issues, however, are raised by the question how far a State is required to go in assisting the press (or others) to gather information, or, in the context of the present case, how far the State is constitutionally required to keep court proceedings public, or court files open, in order to lend such support to intending publishers. See the discussion in Note, The Rights of the Public and the Press to Gather Information, 87 Harv. L. Rev. 1505 (1974). The cases suggest that the State must afford "some protection for seeking out the news,"[10] but the dimensions of the obligation are as yet unclear. The Court in the gag order cases expressly reserved the question whether, or to what extent, the pre-trial court proceedings in those criminal matters could have been closed to the public and thus to the press, leaving all free to publish what they could derive from other sources. *Nebraska Press Ass'n, supra* at 564 n.8; *Oklahoma Publishing Co., supra* at 310-311.[11] The considerations will vary with the situations, some approaching the field of force of "prior restraint," others not.[12]

---

[10] "[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg* v. *Hayes,* 408 U.S. 665, 681 (1972).

[11] The general question had been previously adverted to and passed over in *Cox Broadcasting Corp.* v. *Cohn,* 420 U.S. 469, 496 n.26 (1975).

[12] In the aftermath of the gag order cases, we have *In re Washington Post Co.,*      F.2d      (4th Cir. 1976) (Nos. 76-1695, 76-1698, 76-1699, 76-1711 [4th Cir. July 19, 1976]), where the court in a brief opinion vacated, on application of a publisher, as "an unnecessary prior restraint," an order of a district judge which, in view of the approach of trial, impounded all subsequent filings in a criminal prosecution involving the Governor of a State.

For further discussion (among Federal authorities) relevant to protection of news gathering, see *KQED, Inc.* v. *Houchins,* 546 F.2d 284 (9th Cir. 1976), stay granted pending application for certiorari, 429 U.S. 1341 (1977); *United States* v. *Mitchell, supra* at 1260-1261 & n.39;

Examining the present case on its particular facts in the light of traditional values, we find that the question posed is quite narrow; it comes down to whether, without offense to the Constitution, a judge may decide, in aid of a clear legislative design, to withhold from public disclosure the materials which are alleged ex parte to base a serious accusation against a person before that accusation is put to the proof.[13] If the answer to this question should be no, we would perhaps have to say that it is only history, not considerations of fairness, that justifies the secrecy of grand jury proceedings.[14] So also a curious and heretofore unrecognized challenge would be put to our own rules on cloture during the investigatory and accusatory phases of disciplinary proceedings against attorneys, and during a like phase of procedures leading to possible corrective or disciplinary action against judges.[15] In this view we need not involve ourselves in the question of the wisdom or legality in other contexts or for other purposes of the confidential protections customarily accorded to

---

*CBS* v. *Young,* 522 F.2d 234, 238-242 (6th Cir. 1975); *Chicago Council of Lawyers* v. *Bauer,* 522 F.2d 242 (7th Cir. 1975), cert. denied sub nom. *Cunningham* v. *Chicago Council of Lawyers,* 427 U.S. 912 (1976); *Lewis* v. *Baxley,* 368 F. Supp. 768, 775-780 (M.D. Ala. 1973) (three-judge court) (two to one decision); *Garrett* v. *Estelle,* 424 F. Supp. 468 (D.N. Tex. 1977); *Trimble* v. *Johnston,* 173 F. Supp. 651, 655-656 (D.D.C. 1959). Cf. *Pell* v. *Procunier,* 417 U.S. 817, 834 (1974); *Kleindienst* v. *Mandel,* 408 U.S. 753, 762-763 (1972); *Zemel* v. *Rusk,* 381 U.S. 1, 16-17 (1965).

[13] We think the judges were entitled to take into account, among other things, the fact that the responsible public official was agreeing to impoundment and that it was part of her responsibility, if the need arose, to speak opportunely to the public with the authority of her office. Cf. n.19 below.

[14] "Despite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings, our own conferences, the meetings of other official bodies gathered in executive session, and the meetings of private organizations." *Branzburg* v. *Hayes,* 408 U.S. 665, 684 (1972).

[15] See S.J.C. Rule 4:01, § 20, 365 Mass. 696 (1974), and 3:17, as amended, 371 Mass. 905 (1977). Nor are these provisions singular. See N.Y. Judiciary Law § 44 (McKinney 1968, Supp. 1977); *id.* at § 90 (10) (McKinney 1968).

reports of examination of banks and similar information.[16]

6. It was suggested that we should not reach the substance of this appeal because the Superior Court action between the bank and the commissioner was voluntarily withdrawn by the bank just prior to the last hearing before the single justice of this court (and it further appears that about the same time the president and two members of the board of investment left office). The record, however, remains impounded, and we suppose that the newspaper may have a possible interest in applying (presumably in the Superior Court) to release such material, if any, as may no longer deserve protection.[17] Our current opinion may be of some value in helping to rule on an application of that sort. But, apart from this consideration, it seems to us that the present appeal is saved from dismissal for mootness because the question how a judge should approach impoundment in like or comparable situations, while the material is still news and not yet history, is one "capable of repetition, yet evading review," as the Court had occasion to note in *Nebraska Press Ass'n, supra* at 546, quoting from *Southern Pac. Terminal Co.* v. *ICC*, 219 U.S. 498, 515 (1911), where a similar argument of mootness was made and rejected.

7. There was a further suggestion that an action would not lie under c. 211, § 3, since "another remedy" was "ex-

---

[16] One may note (but not necessarily endorse without qualification) the contentions that such protective treatment encourages candor as between the bank and the regulatory authorities; respects the justifiable expectations of privacy of depositors and creditors whose affairs might otherwise be disclosed without substantial reason; preserves legitimate competitive advantages of the bank; and forestalls public anxiety ("runs on the bank") that may be occasioned by inexpert interpretation of the reports. Of course these propositions must be seen in relation to the whole administrative system envisaged by a banking law.

[17] It was suggested that the impoundment might have been selective, but examination of the papers indicates that a judge reasonably could find that such an effort would not have been appreciably helpful at the time in the light of the purpose of the impoundment. We fully agree that the scope of an impoundment should not in any case exceed the need.

pressly provided" (see text at note 2, *supra*). But, as the briefs and argument demonstrated, it was a matter of considerable doubt what that remedy was — how one might go about asserting the alleged illegality of an impoundment order entered in an action to which one was not a party. In the circumstances there is jurisdiction under the superintendency statute to resolve the doubt and settle a general rule. See *Kennedy* v. *District Court of Dukes County,* 356 Mass. 367, 373 (1969). We now hold, as a general rule, that a stranger seeking relief against an impoundment order may bring a civil action in the court which issued it, joining the clerk of that court in his official capacity and the parties to the action or at least any who obtained or may defend the order.[18] Cf. *United States* v. *Mitchell,* 551 F.2d 1252, 1259-1260 (D.C. Cir. 1976), cert. granted sub nom. *Nixon* v. *Warner Communications, Inc.,* 430 U.S. 944 (1977). It is unnecessary further to characterize such an action; a publisher has standing to maintain suit to vacate an impoundment order entered in a separate action (see *id.*; *CBS* v. *Young,* 522 F.2d 234, 237-238 [6th Cir. 1975]), and suitable defendants can be found to litigate the matter. The action will end in a judgment capable of appeal under ordinary rules. (Special expedition may be needed at every stage.)

It is proper to add that the carrying out of such litigation leaves room for useful steps out of the normal course. Thus in refusing to vacate an impoundment in a case like the present, the judge, preferably with agreement of the parties, might find it feasible, and consistent, to make a publishable statement describing the general nature of the action without divulging details. Here the parties themselves issued such a statement for the reassurance of the public when the Superior Court action was volun-

---

[18] The present case was unusual as the newspaper did not institute suit until orders had been entered in three courts. Even where such multiple orders have been entered, practical arrangements can be made so that one action rather than three may be made to serve. See note 3 *supra.*

tarily withdrawn.[19] Indeed, to move backward in time, the occasion for the present appeal might have been obviated altogether had the judge of the Superior Court taken the step — again preferably by agreement and possibly after inviting comments from counsel for the local press — to make an appropriate statement at the same time as he allowed the motion to impound.[20] In saying this we do not suggest that impoundment orders may be lightly granted if accompanied by explanations. The "general principle of publicity" remains, and it is only in a clearly meritorious case that impoundment can be contemplated.[21]

*Judgment affirmed.*

### APPENDIX

General Laws c. 167, § 5, as appearing in St. 1975, c. 463, reads: "If, in the opinion of the commissioner, any officer of any bank, including a director or trustee thereof, has violated any law relating to such bank or has conducted the business of such bank in an unsafe or unsound manner or has used his official position in a manner contrary to the interests of such bank or its depositors or has been negligent in the performance of his duties, the commissioner may, in his discretion, send a statement of facts about such conduct to the executive officer, and each director or trustee of the bank affected. Within such reasonable time as the commissioner may direct, a special meeting of the directors or trustees of the bank shall be held with respect to the statement of the

---

[19] The joint statement read thus: "The Massachusetts Banking Department and the Bass River Savings Bank today announced that the law suit between them has been voluntarily dismissed on the bank's motion. Banking Commissioner Carol S. Greenwald reaffirmed her recent statement in which she declared that the Bank is financially safe and in sound condition as of the last examination (Nov. 10, 1975) and that there is no evidence whatsoever of any dishonesty or malfeasance by any of the employees of the Bank. The dispute between the Banking Department and the Bank arose from fundamental policy differences in the area of commercial lending."

[20] The literature on "fair trial-free press" contains interesting procedural suggestions, but mainly directed to the more exigent problems in the criminal field. See, e.g., ABA Standards Relating to Fair Trial and Free Press §§ 2.3, 3.1, 3.2 (Approved Draft 1968). See also Annot., 62 A.L.R.2d 510 (1958), on the handling in court of the familiar problem of "trade secrets."

[21] We acknowledge with thanks the briefs filed by the Massachusetts Newspaper Publishers Association and The Reporters Committee for Freedom of the Press as friends of the court.

commissioner. If, in the opinion of the commissioner, appropriate action is not taken to protect the interests of the bank or its depositors, or if such conduct is continued, the commissioner shall cause notice to be served on such officer, director or trustee to appear, and show cause why he should not be removed from office. A copy of such notice shall be sent by registered mail to each officer, director or trustee of the bank affected. A copy of such notice shall be sent to a board composed of the state treasurer, the attorney general, and the commissioner of corporations and taxation. The members of the board or a duly authorized representative shall be present at any appearance of such officer, director or trustee. If, after granting the officer, director or trustee so summoned a reasonable opportunity to be heard, the commissioner finds that he has been guilty of any such delinquency, the commissioner, in his discretion, may order that such officer, director, or trustee be removed from office and from participation in the management of such bank. A decision by the commissioner to remove such officer, director or trustee may be reversed by a decision of the majority of the members of the board made within five business days after the commissioner's decision to remove; otherwise, any such decision of the commissioner shall be given full force and effect. Copies of such order shall be served upon the delinquent officer and upon such bank, whereupon such officer shall cease to be an officer of such bank and shall no longer participate in any way in the management thereof provided, that such order and the findings of fact upon which it is based shall not be made public or disclosed to anyone except the delinquent officer and the other officers, directors and trustees of such bank, otherwise than in the course of any judicial proceeding under this section. The commissioner shall thereupon transmit to the attorney general a transcript of the evidence and finding, and the attorney general shall, on behalf of the commonwealth, institute such proceedings as he may deem necessary. Any person removed from office as herein provided who thereafter participates in any manner in the management of any bank in the commonwealth shall be punished by imprisonment in the state prison for not more than five years or by a fine of not more than five thousand dollars, or both.

"Within twenty days after the service of an order of removal under this section upon the person removed thereby, he may file a petition in the supreme judicial court for the county of Suffolk for a review of the removal but, pending such review, the order shall remain in full force and effect. The court shall have jurisdiction in equity to annul, reverse or affirm such order, shall review all questions in accordance with the standards for review provided in paragraph (8) of section fourteen of chapter thirty A and may make any appropriate order or decree. The decision of the court shall be final and conclusive."