GLOBE NEWSPAPER COMPANY *vs.* SUPERIOR COURT.

Suffolk. October 9, 1979. — February 26, 1980.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Constitutional Law*, Public trial, Freedom of speech and press, Vagueness of statute. *Statute,* Construction. *Practice, Criminal,* Public trial, Judicial discretion. *Rape. Witness,* Victim. *Words,* "Trial," "Shall."

Discussion of G. L. c. 278, § 16A, requiring the exclusion of the general public from the court room "at the trial" of certain kinds of criminal cases, and the common law practice of open trials. [850-856]

In G. L. c. 278, § 16A, the words "at the trial" are ambiguous permitting resort to legislative history and other extrinsic aids in interpreting the statute. [857-861] QUIRICO, J., dissenting.

General Laws c. 278, § 16A, requiring the exclusion of the general public from the court room "at the trial" of certain kinds of criminal cases, relates to closure of the trial during the victim's testimony. [861] QUIRICO. J., dissenting.

The word "shall" in G. L. c. 278, § 16A, is used in a mandatory, rather than a directory sense with respect to those portions of the trial during which the victim testifies. [862-863]

Reporters for the news media are not "such persons as may have a direct interest in the case," excepted from exclusion at the trial of certain kinds of criminal cases under G. L. c. 278, § 16A. [863-864]

Under G. L. c. 278, § 16A, requiring the exclusion of the general public when the victim is testifying at the trial of certain kinds of criminal cases, the judge may exercise his discretion to close other parts of the trial. [864-865]

Guidelines for excluding the general public from the trial of certain kinds of criminal cases during parts of the trial when the victim is not testifying. [865]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on April 25, 1979.

The case was heard by *Braucher, J.*

*James F. McHugh (Janis M. Berry* with him) for the plaintiff.

*Mitchell J. Sikora, Jr.,* Assistant Attorney General (*Alan B. Sherr,* Assistant Attorney General, with him) for the defendant.

*Marguerite M. Dolan,* for the Greenfield Recorder, amicus curiae, submitted a brief.

*James C. Heigham,* for the Massachusetts Newspaper Publishers Association, amicus curiae, submitted a brief.

*Ralph E. Gordon, Sr.,* amicus curiae, pro se, submitted a brief.

LIACOS, J.  On April 25, 1979, the plaintiff, Globe Newspaper Company (Globe), petitioned a single justice of this court for extraordinary relief pursuant to G. L. c. 211, § 3. The petition challenged the April 25, 1979, order of a trial judge of defendant Superior Court, who acted under the authority of G. L. c. 278, § 16A, to close a criminal trial to the general public.  The judge had denied the Globe's motion to intervene and had denied the Globe's motion for a hearing and motion to revoke the order concerning exclusion of the press.  Thus, the Globe sought from the single justice a temporary restraining order and permanent injunction ordering the judge to permit members of the press to attend the trial and related proceedings.  On April 26, 1979, as the jury in the criminal trial were being empanelled, a single justice conducted a hearing on the Globe's petition and denied it after stating orally his reasons for his decision.  A judgment was entered on May 7, 1979.[1]  The Globe appeals.  Mass. R. A. P. 1 (b), 365 Mass. 844 (1974).

During the pendency of this appeal, the criminal trial proceeded to its conclusion.  Thus, the issue raised before the single justice is now moot, and the appeal from his judg-

---

[1] The opinion of the United States Supreme Court in *Gannett Co.* v. *DePasquale,* 443 U.S. 368 (1979), had not been given at the time of the hearing before the single justice.

ment must be dismissed. The issues raised by this record, however, are significant and troublesome, and are "capable of repetition yet evading review." *Southern Pac. Terminal Co.* v. *ICC*, 219 U.S. 498, 515 (1911). *Gannett Co.* v. *DePasquale*, 443 U.S. 368, 377-378 (1979). We deem it appropriate therefore to express our views on the issues argued. *Wellesley College* v. *Attorney Gen.*, 313 Mass. 722, 731 (1943). In so doing, we consider matters now part of the record, but which were not put before the single justice.

Although neither the single justice nor this court is compelled to take the allegations in the Globe's petition as true, we may do so in light of the circumstances that the Commonwealth did not file an answer, Mass. R. Civ. P. 8 (d), 365 Mass. 749 (1974), and that the facts alleged in the petition are not disputed. The petition shows that on or about April 19, 1979, the Superior Court in the county of Norfolk commenced hearings with respect to preliminary motions in the case of Commonwealth *vs.* Albert Aladjem, Superior Court, Norfolk County, No. 73102-9. The court caused a sign marked "closed" to be placed on the court room door, and court personnel turned away people seeking entry.[2] After failing to gain entry on April 24, 1979, counsel for the Globe on April 25 attempted to file with the court the motion to intervene and the other two motions. At the commencement of proceedings before the court, the judge ruled that he would not accept the Globe's motions as being proper for filing. Without holding a hearing and without argument of counsel, the judge ordered that the trial be closed and the press and general public excluded. Counsel for the defendant objected to the closure order, and the assistant district attorney stated that the Commonwealth did not request closure.

The transcript of the hearing before the judge is annexed to plaintiff's petition. It reveals that the Aladjem case in-

---

[2] Court personnel later told some members of the press that they could enter during the preliminary hearings. Apparently one reporter did enter, but the judge told him that he should not publish information received at the hearing.

volved three girls, ages sixteen, sixteen and seventeen at the time of trial. The indictments contained allegations of forcible rape and forced unnatural rape. The judge ruled that G. L. c. 278, § 16A, requires closure. He stated, "This ruling and Order results from a reading of the statute and from the feeling of the Court that a child-victim of an alleged sexual attack is entitled minimally to at least the same protection that a child-defendant in a case involving sexual matters has."

At the April 26 hearing before the single justice, the Globe and the Attorney General appeared. The assistant district attorney also appeared and stated: "[W]here the defendant is asserting his right to a constitutional, public trial, a trial judge may consider that as outweighing the otherwise legitimate statutory interest, particularly where the Commonwealth on behalf of the victims, and this is literally on behalf of the victims in the sense that they were consulted fully by the prosecutor in this case. The Commonwealth waives whatever rights it may have to exclude the press."

In a supplemental statement, the parties stipulated to facts concerning events after the April 26 hearing. In an April 30 conference with the trial judge, the assistant district attorney represented that she had spoken with the three victims about the presence of the press in the courtroom; the victims stated that they would not object to inclusion of the press if the press promised not to print any personal data about them, photograph them, or attempt to interview them. On May 10, 1979, following a jury trial, the defendant Aladjem was found not guilty.

The Globe argues that the single justice erred in denying its petition, claiming that G. L. c. 278, § 16A, did not authorize the judge to exclude the press from the Aladjem trial. This argument relies not only on statutory language and purpose, but also the principle that a statute should be construed to avoid constitutional doubts. We agree in part that the order closing the entire trial was in error. The Globe also raises several constitutional issues. The Globe contends that the First Amendment to the Constitution of

the United States and art. 16 of the Declaration of Rights of the Constitution of Massachusetts protect the right of the public and press to be present during the conduct of criminal trials. In particular, the Globe argues that G. L. c. 278, § 16A, is overbroad and was applied unconstitutionally in this case. Also, the Globe maintains that the trial court's failure to hold a hearing on the closure issue violated the Globe's rights to due process of law. Finally, the Globe argues that the Sixth Amendment creates a right in the public to attend criminal trials. We reach only some of these questions today.[3]

1. The Globe argues that G. L. c. 278, § 16A, is ambiguous and is unconstitutional. Before we can turn to these constitutional arguments, we must construe G. L. c. 278, § 16A, in light of the asserted ambiguity.[4] See *Bellotti* v. *Baird*, 443 U.S. 622, 644 n.24 (1979); *Poulos* v. *New Hampshire*, 345 U.S. 395, 402 (1953). In considering the claimed ambiguity, we are mindful of two principles of statutory con-

---

[3] Indeed, the single justice could have refrained from deciding any issue on the merits. Ordinarily, we will exercise our jurisdiction under G. L. c. 211, § 3, only "if no other remedy is expressly provided." Here it is arguable that the Globe might have sought a declaratory judgment that G. L. c. 278, § 16A, does not authorize exclusion of the press, and that even if it does, the statute violates the First and Sixth Amendments to the United States Constitution and art. 16 of the Declaration of Rights. G. L. c. 231A.

However, we think the single justice was correct in hearing this matter in view of the doubts concerning the practicality of an alternative remedy in the circumstances, and in view of the significant public issues raised by the petition. We state our views for similar reasons. See *Ottaway Newspapers, Inc.* v. *Appeals Court*, 372 Mass. 539, 550-551 (1977).

[4] General Laws c. 278, § 16A, reads as follows: "At the trial of a complaint or indictment for rape, incest, carnal abuse or other crime involving sex, where a minor under eighteen years of age is the person upon, with or against whom the crime is alleged to have been committed, or at the trial of a complaint or indictment for getting a woman with child out of wedlock, or for the non-support of an illegitimate child, the presiding justice shall exclude the general public from the court room, admitting only such persons as may have a direct interest in the case." As to the constitutionality of the "begetting" statute, G. L. c. 273, § 11, see *Commonwealth* v. *MacKenzie*, 368 Mass. 613 (1975). General Laws c. 273, § 11, was subsequently repealed by St. 1977, c. 848, § 7.

struction. First, "[w]ords or phrases in a statute are to be given their ordinary meaning. They are to be construed according to their natural import and approved usage." *Burke* v. *Chief of Police of Newton*, 374 Mass. 450, 452 (1978). "[T]he statutory language itself is the principal source of insight into the legislative purpose. . . . [W]here the language of the statute is plain and unambiguous, . . . legislative history is not ordinarily a proper source of construction." *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 37 (1977). However, "[i]f the language of a provision is unclear, a court may look to outside sources for assistance in determining the correct construction." *Rosenbloom* v. *Kokofsky*, 373 Mass. 778, 781 (1977).

We consider three possible ambiguities in G. L. c. 278, § 16A. First, to what part or parts of a judicial proceeding does the locution, "At the trial . . . the presiding justice shall exclude the general public," refer? Second, is the word, "shall" used in a mandatory or directory sense? Third, are members of the press "persons" with "a direct interest" in the case? The Globe urges that the latter two questions mark ambiguities in the statute, and it is at least clear that the language "a direct interest" has required construction in the past. *Commonwealth* v. *Marshall*, 356 Mass. 432 (1969). *Commonwealth* v. *Blondin*, 324 Mass. 564 (1949), cert. denied, 339 U.S. 984 (1950). Because neither party has recognized the ambiguity underlying our first question, we take time to explicate it here.

The word "trial" is itself ambiguous. In determining the meaning of a word in a statute, we look to its ordinary lexical meaning. *Burke* v. *Chief of Police of Newton, supra.* "Rather than using terms in their everyday sense, '[t]he law uses familiar legal expressions in their familiar legal sense.'" *Bradley* v. *United States*, 410 U.S. 605, 609 (1973) (citation omitted). In its legal definition of "trial," Webster's New International Dictionary 2705 (2d ed. 1959) suggests that the term has several senses: "In a general sense *trial* includes all proceedings from the time when issue is joined, or more usually when the parties are called to try their case in court,

to the time of its final determination; in criminal law the term *trial* is, however, generally restricted to proceedings subsequent to swearing in the jury." This range of meanings also appears in Black's Law Dictionary 1675 (rev. 4th ed. 1968). Despite the dictionaries' suggestion that "criminal trial" should be defined restrictively, our older cases have endorsed a definition of "trial" as "the examination before a competent tribunal, according to the laws of the land, of the facts put in issue in a cause, for the purpose of determining such issue." *Commonwealth* v. *Soderquest,* 183 Mass. 199, 201 (1903), overruled on other grounds, *Commonwealth* v. *Penrose,* 363 Mass. 677, 679-681 (1973). This definition is broader than the lexical definition. Fact-finding hearings may occur before the jury are empanelled. A hearing to determine whether there is probable cause to bind a defendant over for trial is an example. It is not clear whether a hearing on a motion to suppress would constitute "examination . . . of the facts put in issue in a cause." Cf. *Commonwealth* v. *Soderquest, supra* (arraignment is not trial). According to our cases' definition, then, the distinction between "trial" and "pretrial" is not plain. But compare Mass. R. Crim. P. 13, 14, 378 Mass. 871, 874 (1979), with Mass. R. Crim. P. 19, 20, 378 Mass. 888, 889 (1979). The recent disagreement among members of the United States Supreme Court concerning the applicability to a motion to suppress of the word "trial," appearing in the Sixth Amendment, is further evidence that the distinction is blurred. See *Gannett Co.* v. *DePasquale, supra.* Indeed, it is not clear that the "trial" necessarily encompasses all events occurring after the jury are empanelled. For example, a side bar conference, a hearing of legal arguments, or a voir dire hearing held in the absence of the jury to determine the admissibility of evidence may not meet the *Soderquest* definition. Thus, "trial" has no single, irresistible interpretation.

Even if we assume that "trial" has an unambiguous meaning, the sentence, "At the trial . . . the presiding justice shall exclude the general public," is still ambiguous. "At the trial" is ambiguous, for "At" may mean "through-

out," but it may also mean "at some time in" or "during parts of." Thus, the legislative order, "At the trial the presiding justice shall charge the jury," would not imply that the charge should continue throughout the entire trial. On the other hand, "At the trial the presiding justice shall maintain order in the court room" would apply throughout. The meaning of the sentence varies with the nature of the act which the judge is ordered to do. Certain acts, such as a jury charge, occur once and within a limited time. Others, such as maintaining order, are continuous. And some acts, such as excluding the general public, can logically occur at many stages of the trial. Thus, even if "trial" has a definite signification, neither the words of the statute alone nor the nature of the act commanded settles whether G. L. c. 278, § 16A, requires partial or wholesale closure.

2. In order to resolve the ambiguities in G. L. c. 278, § 16A, we must first consider whether any principles of statutory construction should influence our analysis. At least two such principles exert pressure in this case. It is well-established that a "statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *United States* v. *Jin Fuey Moy*, 241 U.S. 394, 401 (1916) (Holmes, J.). Accord, *Commonwealth* v. *King*, 374 Mass. 5, 15 (1977); *Alegata* v. *Commonwealth*, 353 Mass. 287, 290 (1967); *Worcester County Nat'l Bank* v. *Commissioner of Banks*, 340 Mass. 695, 701 (1960); *Ferguson* v. *Commissioner of Corps. & Taxation*, 316 Mass. 318, 323-324 (1944). It is also well settled that a statute in derogation of the common law should be strictly construed, so long as the construction is consistent with the statutory purpose. See *Hayon* v. *Coca Cola Bottling Co.*, 375 Mass. 644, 648-649 (1978); *Vallin* v. *Bondesson*, 346 Mass. 748, 753 (1964); *Houghton* v. *Dickinson*, 196 Mass. 389, 391 (1907).

(a) The Globe raises several questions about the constitutionality of excluding the press from a criminal trial. In the face of those arguments and the United States Supreme Court's uncertain posture on the issues, see *Richmond*

*Newspapers, Inc.* v. *Virginia,* 220 Va. cxxix, decided July 9, 1979, which recently has been argued before the Supreme Court on appeal; *Gannett Co.* v. *DePasquale, supra,* we seek to shrink the region of possible constitutional doubts about G. L. c. 278, § 16A. Nevertheless, a number of reasons counsel against our deciding those questions today. We take care to point out that, even if we chose to decide the constitutional questions here presented, the question whether the State's interests outweigh a defendant's Sixth Amendment right to a public trial would in no way be before us; the defendant is not before this court. Furthermore, instead of deciding the moot issues of the Globe's First and Sixth Amendment rights, we await the United States Supreme Court's decision in *Richmond Newspapers, Inc.* v. *Virginia, supra.* Nor do we reach the question of press or defendant rights under the State Constitution. The Globe's contentions relying on art. 16 were not adequately argued in plaintiff's brief. Mass. R. A. P. 16 (a) (4), as amended 367 Mass. 919 (1975). Indeed, the Globe's brief relegates the Constitution of this Commonwealth to one cursory, conclusory footnote. See *Beaton* v. *Land Court,* 367 Mass. 385, 389, appeal dismissed, 423 U.S. 806 (1975). As for State constitutional rights analogous to those arguably available under the Sixth Amendment, the Globe's brief is silent, and our Constitution is unclear, about the right to a public trial.

Finally, we decline to reach the constitutional questions because "[a] court will ordinarily 'not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of . . . . Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.'" *Fazio* v. *Fazio,* 375 Mass. 394, 405 (1978). See *Commonwealth* v. *Gustafsson,* 370 Mass. 181, 186 (1976). We can decide the present case on nonconstitutional grounds. Therefore, we do so. Also, because our second principle of construction — that statutes in derogation of the common

law should be strictly construed — argues for a construction favoring publicity, our result minimizes constitutional doubts about G. L. c. 278, § 16A. Although we do not squarely reach the constitutional questions raised today, we believe that the principles of construction we adopt bring us to a conclusion which approximates the results urged upon us by the Globe on constitutional grounds.[5] We turn to consideration of the relationship between G. L. c. 278, § 16A, and the common law.

(b) Public trials have been the rule at common law since the Anglo Saxons conducted their trials "like an ill-managed public meeting." F. Pollock, The Expansion of the Common Law 30 (1904). *In re Oliver*, 333 U.S. 257, 266 (1948). See generally *Gannett Co. v. DePasquale*, 443 U.S. 368, 386 n.15 (1979). *Id.* at 418-427 (Blackmun, J., dissenting). Although in 1884 Mr. Justice Holmes' famous dicta stated some of the reasons for the rule, *Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884),[6] this long established precept, so imbedded in our practice, required no explication until 1949. In *Commonwealth v. Blondin*, 324 Mass. at 569-570, while sustaining G. L. c. 278, § 16A, against a due process attack, we noted "the universal practice of our courts, especially in criminal cases, to keep the doors open, except as otherwise provided by statute."

Public trials protect against systematic use of the courts as instruments of political and religious persecution. *In re Oliver, supra* at 268-270. Publicity prevents abuses of a single judge's power. *Id.* at 270-271. See 1 J. Bentham, Rationale of Judicial Evidence 524 (J.S. Mill ed. 1827). The pressure of public scrutiny may deter witness perjury; *Com-*

---

[5] This approximate parellelism extends not only to the substantive doctrine, but also to procedural safeguards. See part 5, *infra.*

[6] "It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed."

*monwealth* v. *Bohmer,* 374 Mass. 368, 380 n.14 (1978), and may engender confidence in court officials. *Gannett Co.* v. *DePasquale,* 443 U.S. 368, 429 (1979) (Blackmun, J., dissenting). Open trials may also induce members of the public to come forward with new testimony or other evidence. *Commonwealth* v. *Bohmer, supra* at 380 n.14. Other benefits of publicity are more abstract. As the audience of the courts' struggle to do justice, the public learns how courts work and may suggest how courts can improve. At the same time, the public experiences the drama of justice being done. Like theater, the judicial drama teaches the audience not to make the participants' mistakes — it deters criminal misconduct — and permits a catharsis — a sense that wrongs have been righted.[7] Thus, the common law practice of open criminal trials improves the quality of justice done in the courts and binds the courts more closely to the society they serve. General Laws c. 278, § 16A, was enacted against the background of the common law tradition, and that is why we said in *Commonwealth* v. *Blondin, supra* at 571: "It is to be strictly construed in favor of the general principle of publicity."

---

[7] "[B]y publicity, the temple of justice adds to its other functions that of a school: a school of the highest order, where the most important branches of morality are enforced by the most impressive means: a theatre, in which the sports of the imagination give place to the more interesting exhibitions of real life. Sent thither by the self-regarding motive of curiosity, men imbibe, without intending it, and without being aware of it, a disposition to be influenced, more or less, by the social and tutelary motive, the love of justice. Without effort on their own parts, without effort and without merit on the part of their respective governments, they learn the chief part of what little they are permitted to learn (for the obligation of physical impossibility is still more irresistible than that of legal prohibition), of the state of the laws on which their fate depends." 1 J. Bentham, *supra* at 525. See Note, Trial Secrecy and the First Amendment Right of Public Access to Judicial Proceedings, 91 Harv. L. Rev. 1899, 1906-1909 (1978). See also Note, The Right to Attend Criminal Hearings, 78 Colum. L. Rev. 1308, 1323 (1978). On the purpose of the criminal law to foster legal and moral responsibility in the citizenry, see generally Hart, The Aims of the Criminal Law, 23 Law & Contemp. Prob. 401 (1958).

3. Recognizing the power of the principles favoring publicity, we must identify the precise interests that over-matched the common law rule and thereby justified G. L. c. 278, § 16A, in the Legislature's eyes.[8] In *Blondin, supra* at 571, we considered the Legislature's purpose in enacting G. L. c. 278, § 16A. "Doubtless it was thought that female witnesses in particular could come forward, institute com-plaints, and testify with less reluctance, so that more justice would be accomplished if they could be relieved from the inhibitions imposed by the presence of a curiosity impelled audience." Although this formulation is generally correct, it does not put the matter strongly enough.

Originally enacted in St. 1923, c. 251, with the title "An Act to protect witnesses under the age of seventeen at trials for certain crimes," the statute was designed "for the pro-tection of minors from the vulgar and obscene and from public degradation." 1923 House Doc. No. 1349. In St. 1931, c. 205, the statute was revised as part of a com-prehensive reexamination of the treatment of children in the Commonwealth. 1931 House Doc. No. 1200. The Special Commission Established to Investigate the Laws Relative to Dependent, Delinquent and Neglected Children, and Chil-dren Otherwise Requiring Special Care stated the statutory purpose: "To spare girls of juvenile age the embarrassment, humiliation and demoralization of testifying to all the sor-did details of rape, incest, carnal abuse or other crime in-

---

[8] "If the statute, because it modifies the common law, is to be strictly construed, yet the construction adopted should advance, rather than defeat, the purpose of the Legislature." *Houghton* v. *Dickinson,* 196 Mass. 389, 391 (1907). The Legislature, of course, has power to create ex-ceptions to the rules of common law, *New Bedford Standard Times Publishing Co.* v. *Clerk of the Third Dist. Court of Bristol,* 377 Mass. 404, 410-411 (1979), and the common law itself provided for exceptions to the rule of publicity. See *Commonwealth* v. *Blondin,* 324 Mass. 564, 571-572 (1949), cert. denied, 339 U.S. 984 (1950). Thus, we said in *Ottaway Newspapers, Inc.* v. *Appeals Court,* 372 Mass. 539, 546 (1977): "These statutes do not preclude the exercise by judges of a sound discretion to im-pose reasonable cloture, including impoundment, in other cases when found necessary."

volving sex, incidental to open trial with examination and cross-examination." *Id.* at 90.

This legislative history reveals that G. L. c. 278, § 16A, stands at the nexus of two overlapping strands of policy; the Legislature wished to shield certain victims of sex crimes from the difficult experience of testifying in public;[9] and the Legislature joined this solicitude for victims with the broad, paternal protection afforded children generally.[10] The rape victim's ordeal in court has been well documented.[11] It

[9] Since G. L. c. 278, § 16A, was enacted, the Commonwealth has demonstrated sensitivity for the rape victim's plight in other ways. G. L. c. 41, § 97B (rape victim reporting, prosecuting and counseling services); G. L. c. 41, § 97D (reports of rape and attempted sexual assault must be kept confidential); G. L. c. 233, § 21B (limiting admissibility of evidence of victim's sexual history and reputation). See also *Commonwealth* v. *Gibbons,* 378 Mass. 766, 768-769, 774 & n.11 (1979).

[10] Many statutes are designed to protect the identity of minors who are subjects of litigation. See e.g., G. L. c. 119, § 60A (Juvenile Court records not open to public inspection); G. L. c. 119, § 65 (excluding public from Juvenile Court sessions). See also G. L. c. 119, § 60 (limiting uses of delinquency adjudication) held unconstitutional in part in *Commonwealth* v. *Ferrara,* 368 Mass. 182 (1975); G. L. c. 210, § 5C (records of adoption proceedings must be segregated); G. L. c. 276, § 100B (juvenile probation and court records may be sealed after three years from final entry). Generally, the purpose of these statutes is to prevent stigmatization of minors and to encourage rehabilitation. See generally *Police Comm'r of Boston* v. *Municipal Court of the Dorchester Dist.,* 374 Mass. 640, 651-652, 666-668 (1978). In the case of a juvenile defendant, the compulsion of those purposes is strong. In the case of the innocent victim of a sexual assault, the obligation not to aggravate her injuries is very strong indeed.

[11] E.g., J. Bode, Fighting Back, ch. 7 (1978); L. Brodyaga, M. Gates, S. Singer, M. Tucker & R. White, Rape and its Victims: A Report for Citizens, Health Facilities, and Criminal Justice Agencies, cc. 8-9 (1975) (hereinafter LEAA Report); E. Hilberman, The Rape Victim, cc. 2, 7, 8 (1976); L. Holmstrom & A. Burgess, The Victim of Rape, cc. 6-8 (1978); S. Katz & M. Mazur, Understanding the Rape Victim, cc. 12, 14, 15 (1979); J. MacDonald, Rape, 128-130 (1971); C. Bohmer, Judicial Attitudes Toward Rape Victims (D. Chappell, R. Geis & G. Geis eds. 1977); A. Burgess & A. Laszlo, When the Prosecutrix is a Child: The Victim Consultant in Cases of Sexual Assault, in Victims and Society (E. Viano ed. 1976); Libai, The Protection of the Child Victim of a Sexual Offense in the Criminal Justice System, 15 Wayne L. Rev. 977 (1969); O'Neale,

has been said that "[t]he court experience, for the rape victim, precipitates as much of a psychological crisis as the rape itself."[12]  In fact, the victim may feel that she has been raped twice: once by the defendant and once by the criminal justice system.[13]  A rape victim who anticipates humiliation or embarrassment may choose not to come forward at all, or, if she comes forward, may abandon her participation midway through the case.[14]  Even if she continues to participate in the criminal process, she may become so distressed that she cannot testify effectively.

This is especially true for the child victim of rape.  The child's delicate psyche has few resources to help it withstand the trauma of sexual assault.  Furthermore, "[i]t is generally agreed by child psychiatrists that the degree of psychic trauma is as much, or perhaps more, dependent on the way that the child victim is treated after discovery than at the time of the offense itself."[15]  Even an adult victim confronted with the criminal justice system is typically "frightened, confused, and reticent."[16]  For a child with only the barest understanding of the purposes and procedures of a trial, the act of giving evidence may be particularly difficult and bewildering.[17]

One of the most disturbing aspects of the trial for many victims is testifying in public.[18]  The victim is often embar-

---

Court Ordered Psychiatric Examination of a Rape Victim in a Criminal Rape Prosecution — Or How Many Times Must a Woman be Raped, 18 Santa Clara L. Rev. 119 (1978).

[12] L. Holmstrom & A. Burgess, *supra* note 11, at 229.

[13] J. Bode, Fighting Back, c. 7 (1978).  L. Holmstrom & A. Burgess, *supra* note 11, at 235-236.

[14] S. Katz & M. Mazur, Understanding the Rape Victim 197-198 (1979).

[15] Libai, *supra* note 11, at 980-981.  See E. Hilberman, The Rape Victim 53 (1976).

[16] LEAA Report at 105.

[17] See A. Burgess & A. Laszlo, *supra* at note 11; C. Bohmer, *supra* note 11, at 166-168.  J. MacDonald, Rape 128 (1971).

[18] L. Holmstrom & A. Burgess, *supra* note 11, at 227; Libai, *supra* note 11, at 979.

rassed to discuss intimate and painful matters before a group of strangers. The victim may also fear that she will be held up to public ridicule. A researcher has described the experience of typical child victims: "[A] child is likely either to be confused and frightened by the presence of many persons, or impressed with this unusual opportunity for enthralling a large audience with his stories. In both cases the public's presence may serve to interfere with the child's powers of recollection and narration. In addition, psychiatrists have observed that 'the victim naturally wishes to avoid publicity, the embarrassment which accompanies questioning by authorities, or courtroom experiences. Children in particular are often profoundly disturbed by this situation.'"[19] Recognizing the problem, judges and commentators have considered clearance of the courtroom during the victim's testimony.[20]

Thus, the purpose of G. L. c. 278, § 16A, is to encourage young victims of sexual offenses to come forward; once they have come forward, the statute is designed to preserve their ability to testify by protecting them from undue psychological harm at trial. See *Commonwealth* v. *Leo, ante* 34, 38 (1979). In broader terms, the statute's purposes go beyond protection of juvenile privacy to encompass the State's interest in sound and orderly administration of justice; most important, the statute helps obtain just convictions for the types of crimes from which the victims had often suffered at the hands of the criminal justice system, while their asssail-

---

[19] Libai, *supra* note 11 at 1021 (footnote omitted). See E. Hilberman, *supra* note 11, at 53; S. Katz & M. Mazur, *supra* note 11, at 199-200, 233-236.

[20] C. Bohmer, *supra* note 11, at 167. LEAA Report, c. VIII. England and Israel give courts power to exclude the general public when a child victim testifies. Israel, Sweden, and Denmark provide that a court official should question the child privately for the prosecution and defense. See generally Libai, *supra* note 11, at 986-1001; C. Bohmer, *supra* at 167. So, too, a large number of the American States have excluded the public to protect the child victim, either by judicial decision or by statute. See *Gannett Co.* v. *DePasquale,* 443 U.S. at 388 n.19, for a partial listing of American authority.

ants had often gone free. We now construe the statute in light of these purposes.

4. The first question that we must decide is whether the language "At the trial . . . the presiding justice shall exclude the general public" necessarily relates to closure of the entire trial. We have shown the language in question to be ambiguous, and our precedent does not illuminate the point. The legislative history, though equivocal, tends to favor a reading that the statute does not mandate closure of the whole trial. Although the 1931 Special Commission Report speaks of a "private hearing," it does not exclude the possibility that the hearing be private only in part. Moreover, the Report states the purpose of G. L. c. 278, § 16A, as, "[t]o spare girls of juvenile age the embarrassment, humiliation and demoralization of *testifying* . . . incidental to open trial" (emphasis supplied). 1931 House Doc. No. 1200, at 90. In light of the principles favoring publicity, we construe the statute to relate to closure of the trial only during the victim's testimony.[21]

---

[21] The language of G. L. c. 278, § 16C, inserted by St. 1978, c. 316, more clearly states that the closure order may be for the entire trial or "during those portions of such trial when direct testimony is to be presented." We think this 1978 phrasing not to be inconsistent with the view we take of the earlier analogous statute (§ 16A). The Commonwealth implies that G. L. c. 278, § 16A, mandates closing the entire trial. The Commonwealth goes on to imply that in *Commonwealth* v. *Leo, ante* 34, 37-38 (1979), we held that § 16A mandatorily extends the right to a closed trial to the child victim and to her alone. The Commonwealth concludes that the child may make an intelligent and voluntary waiver of her right to full or partial closure. Accordingly, a trial judge should hold a hearing on the waiver issue.

This argument misconceives our holding in *Leo*. We did not say that the victim is the only person who possesses the right to a closed trial. We said that the main purpose of the statute apparently was to protect the Commonwealth's case by protecting its witnesses. *Id.* at 38. Therefore, it was clear that the statute did not give a defendant the right to a hearing from which the press was excluded.

The Commonwealth's suggestion would also place the trial court in the awkward position of having to rule on a child's putative waiver of an important right. Use of a waiver doctrine in this context would entail difficult factual determinations and relatively cumbersome procedures (appointment of counsel and in some cases a guardian). It would place a

We next consider whether G. L. c. 278, § 16A, requires closure of the trial during the victim's testimony. The Globe argues that the Legislature used the word "shall" in G. L. c. 278, § 16A, in a directory, rather than a mandatory, sense. That is incorrect. Although "[t]he word 'shall' as used in statutes . . . is not of inflexible signification and not infrequently is construed as permissive or directory in order to effectuate a legislative purpose," *Swift* v. *Registrars of Voters of Quincy*, 281 Mass. 271, 276 (1932); see *Myers* v. *Commonwealth*, 363 Mass. 843, 846 (1973), "[t]he word 'shall' . . . is commonly a word of imperative obligation . . . ." *Johnson* v. *District Attorney for the N. Dist.*, 342 Mass. 212, 215 (1961). "The general rule whereby directions to public officers for the protection of public or private rights are mandatory may be applied in a like manner to directions to courts." C. Sands, Sutherland Statutory Construction § 57.16, at 439 (4th ed. 1973). Thus, the mandatory construction appears preferable. Treating the statute as directory would frustrate its purposes. If she were uncertain whether she would have to testify in public, a young woman might choose not to cooperate with the police and the prosecutor. She might be deterred from coming forward at all.

Furthermore, legislative history is relevant to a determination whether a statute is mandatory or directory, and "[t]he deliberate refusal of the General Court to adopt a word which plainly would have conferred discretionary power . . . [may], in place of one whose natural purport would compel them . . . [shall], is significant of a settled intention to use the imperative word." *Rea* v. *Aldermen of Everett*, 217 Mass. 427, 431 (1914). Here the Legislature in 1923 sent the Governor a bill, 1923 House Doc. No. 1219, stating that "the court shall exclude the general public." The Governor returned the bill with amendments including a change from "shall" to "may." In an accompanying mes-

---

heavy responsibility on even a mature child. It could also import more uncertainty into the process of testifying and make the victim's experience still more taxing.

sage, the Governor said, "A statute giving the presiding judge the discretion to exclude the public . . . ought to be sufficient . . . ." 1923 House Doc. No. 1349. The version eventually enacted appears to have been a compromise. It provided that "the presiding justice shall, if said trial is before a district court, or may, if before the superior court, exclude the general public . . . ." St. 1923, c. 251. When the Special Commission reviewed the statute in 1931, it stated: "The Commission is very strongly of the opinion that the reasons for a private hearing in such cases, now mandatory in the district courts, are equally compelling in the Superior Court, and the Commission recommends that the above section 16A be amended so that the presiding justice, whether in the Superior or District Court, shall exclude the general public from the court room, admitting only such persons as may have a direct interest in the case." 1931 House Doc. No. 1200, at 90. The Legislature followed the commission's recommendation. This legislative history leaves little room for doubt that the word "shall" in G. L. c. 278, § 16A, is mandatory as to the victim's testimony.[22]

The Globe contends that it should not be excluded under G. L. c. 278, § 16A, because it is among "such persons as may have a direct interest in the case." In *Blondin, supra* at 571, the Globe argues, we provided for liberal construction of the clause, and we said: "The intent was to distinguish between persons having a legitimate reason for being present and mere idle spectators who are often attracted in large numbers to sensational trials involving sex issues, not only to the detriment of the community but sometimes to the degradation of justice itself." Because the Globe's reporters have

---

[22] This view is further supported by the language of G. L. c. 278, § 16B (inserted by St. 1949, c. 302), where, as to criminal proceedings in the district court involving husband and wife, it is stated, "[t]he presiding justice . . . may exclude the general public . . . during the trial." General Laws c. 278, § 16C (inserted by St. 1978, c. 316), deals with rape or incest trials and provides that a trial judge "may" exclude "all spectators" on request of the parties and where the defendant waives his right to a public trial in writing. The Legislature clearly knows the difference between the permissive "may" and the mandatory "shall."

a legitimate reason to attend the trial, a reason unrelated to voyeurism, the Globe argues they have a "direct interest."

We have never said that the "direct interest" clause encompasses the press, and in *Blondin, supra* at 572, we expressly reserved the question. We have stated in dictum that the statute does not require exclusion of the defendant's parent, husband, wife, guardian or friend. In *Commonwealth* v. *Marshall,* 356 Mass. 432 (1969), we held that a defendant had a right under G. L. c. 278, § 16A, and the Sixth Amendment to have his mother, brother, sister, and friend present at his trial. However, including a few of the defendant's associates is an entirely different matter from including the press. Admittedly, the presence of a few more persons in the courtroom might not appreciably increase the victim's anxiety about her testimony. But the knowledge that those few extra persons were reporters who might publish her testimony to thousands would probably increase by orders of magnitude her sense of exposure, vulnerability, and alarm. We believe that a policy of admitting the press during young victims' testimony would substantially increase the risk that the Commonwealth would lose the benefit of that testimony.

5. In holding that G. L. c. 278, § 16A, is mandatory only as to the victim's testimony, we do not rule out the possibility that the trial judge might close other parts of the trial. The decision to close any part of the trial other than the victim's testimony or to close the entire trial is a matter within the judge's sound discretion. See *Ottaway Newspapers, Inc.* v. *Appeals Court,* 372 Mass. 539, 546 (1977). Because the judge's discretion in the context of a criminal trial is well settled, we take this opportunity to provide general guidelines for the exercise of that discretion. See *id.* at 550-552; *Kennedy* v. *District Court of Dukes County,* 356 Mass. 367, 373 (1969). As we understand G. L. c. 278, § 16A, and the common law relating to closure of trials, a judge should hold a hearing before entering an order closing parts of the trial other than the victim's testimony. Although we have not ruled that the plaintiff has a constitutional interest, this

view is consistent with the constitutional requirement that a party receive a hearing before suffering a deprivation of such an interest. See *Gannett Co.* v. *DePasquale,* 443 U.S. 368, 401-402 (1979) (Powell, J., concurring); *id.* at 445-446 (Blackmun, J., dissenting). We take this position because of our expressed view of the significance of society's interest in public trials.

In a case in which G. L. c. 278, § 16A, applies, the Commonwealth may move for closure of parts of the trial other than the victim's testimony or for closure of the entire trial. The issue at the hearing shall be whether such closure is necessary to serve the statutory purpose; i.e., to preserve evidence required for a just conviction. For example, if closing all or part of the trial were necessary to assure the availability of evidence of fresh complaint, see, e.g., *Commonwealth* v. *Gangi,* 243 Mass. 341, 344 (1923); W.B. Leach & P.J. Liacos, Massachusetts Evidence 133 (4th ed. 1967), the judge would be justified in ordering closure. The Commonwealth should bear the burden of showing necessity. Furthermore, because of the policy favoring publicity, an agreement between the prosecution and the defense to close the trial should not justify closure nor even be relevant to the judge's determination of necessity.

At the hearing, any person to be excluded from the trial should have an opportunity to state his objections to the order.[23] The person need not file a formal motion to intervene. The public need not receive prior notice of the closure hearing. On the other hand, the court should hear a person who in timely fashion informs the court of his desire to object. The hearing should be completed expeditiously and should not ordinarily involve lengthy legal argument. On conclusion of the hearing, the judge should make findings of fact as appropriate and should rule on the necessity for closure.[24]

---

[23] As we held in *Blondin, supra,* and *Marshall, supra,* the judge may not exclude certain persons with a "direct interest in the case."

[24] Although a judge might abuse his discretion or make an error of law, such an error would not warrant reversal on statutory grounds if raised on

Since the appeal before us involves an issue now moot, it is to be dismissed.

*So ordered.*

QUIRICO, J. (dissenting). General Laws c. 278, § 16A, provides in pertinent part as follows: "At the trial of a complaint or indictment for rape, incest, carnal abuse or other crime involving sex, where a minor under eighteen years of age is the person upon, with or against whom the crime is alleged to have been committed . . . the presiding justice shall exclude the general public from the court room, admitting only such persons as may have a direct interest in the case." It is undisputed that the criminal trial from which employees of the Boston Globe were excluded was one in which the defendant was being tried on indictments charging him with the crimes of forcible rape and forced unnatural rape on victims who were under eighteen years of age.

In part 1 of its opinion, the court holds that the word "trial," as used in the phrase "[a]t the trial" at the beginning of § 16A, is ambiguous. The court then discusses several principles of statutory construction as relating to ambiguous language and by the application of those principles to § 16A it concludes that when the Legislature used the word "trial" it intended it to mean only that part of the trial during which the minor victim testifies.

For the reasons stated below, I am unable to agree with that interpretation of § 16A, and I therefore respectfully dissent from the opinion in that regard.

It is clear from the court's opinion that its conclusion that § 16A "is mandatory only as to the victim's testimony" is not based on any holding that the statute is unconstitutional.

appeal by a defendant. Cf. *Commonwealth* v. *Leo, ante* 34, 37-38, (1979) (G. L. c. 278, § 16A, does not create rights in a defendant). If a defendant should raise at the hearing a constitutional objection to closure, the judge should consider the extent of his constitutional right to a public trial.

The court expressly states that it does not reach the constitutional issues raised by the plaintiff. The court limits itself to the process of statutory construction of an assumedly ambiguous statute. For that purpose it resorts to several aids to interpretation, particularly the legislative history of § 16A, as originally enacted in 1923 and amended in 1931, and various articles appearing in law journals and other publications between 1969 and 1978 on the subject of the ordeal of rape victims in court. See note 11, *supra,* of the court's opinion. I likewise limit this dissent to a consideration of statutory construction, and do not reach any constitutional issues.

1. I do not believe that the words "[a]t the trial," as used at the beginning of § 16A, are ambiguous. I believe that they are used in their usual and ordinary sense, and that as such they include all of the trial proceedings starting with the empanelling of the jury and continuing through the return of the verdict or finding. There may be some exceptions thereto, e.g., voir dire hearings held in the absence of the jury to determine the admissibility of evidence, but it is not necessary for the purposes of this case to identify or define such exceptions precisely. In any event I do not believe that the clear language, given its usual and ordinary meaning, permits the drawing of a distinction between that part of the trial during which a youthful victim of a sex crime testifies and the remainder of the trial during which any other witnesses are testifying.

The language which the Legislature used in § 16A to state its intention to require the exclusion of the general public "at the trial" of persons charged with sex crimes against young victims is not unique to that statute. In G. L. c. 119, § 38, inserted by St. 1954, c. 646, § 1, the Legislature mandated that "[a]ll hearings [of a certain type involving juveniles] shall be closed to the general public . . . ." A similar provision is found in G. L. c. 119, § 65, to the effect that "the court shall exclude the general public from the room" in which hearings are held on certain juvenile matters. General Laws c. 210, § 6, as amended through St. 1971, c. 388, provides that if, at the request of any par-

ty, a probate judge determines that an adoption hearing shall be held in chambers, "the probate judge shall exclude the general public from the hearing." Similarly, G. L. c. 278, § 16B, inserted by St. 1949, c. 302, provides that a District Court judge "may exclude the general public from the court room during the trial of any criminal proceeding involving husband and wife." I know of no claim or suggestion that these statutes should be construed to permit the closure of only certain parts of the trials to which they apply; and I know of no instances of the application of such a limitation by our trial courts as a matter of statutory construction.

It is significant to note that when the Legislature did intend to authorize the exclusion of persons from limited portions of a trial it did not use the general language contained in § 16A and other statutes cited above, but rather it chose language expressly authorizing an exclusion limited to prescribed portions of a trial. This is eloquently demonstrated by G. L. c. 278, § 16C, inserted by St. 1978, c. 316, which provides in part: "To protect the parties involved at a trial arising from a complaint or indictment for incest or rape, the trial judge may exclude all spectators from the courtroom in which such trial is being held, or from said courtroom during those portions of such trial when direct testimony is to be presented," provided certain consents by the parties are first obtained.

In my opinion, a comparison of § 16A with the other statutes discussed above requires a conclusion that the Legislature is capable when drafting statutes of using language which clearly expresses its intent to exclude the general public or spectators from trials generally as distinguished from parts of trials, and that it demonstrated this in its choice of the language of § 16A in sharp contrast to that of § 16C. A comparison of those two sections leaves no support for a claim that § 16A is ambiguous as to what is meant by the words "at the trial."

2. If, as I believe, the language of § 16A is not ambiguous, then there is no need or occasion to resort to the legislative

history of the statute. While "[i]t is permissible to examine records of legislative proceedings incident to the passage of a statute to illumine its doubtful language . . . its plain meaning cannot be thereby affected . . . ." *Plunkett* v. *Old Colony Trust Co.*, 233 Mass. 471, 474 (1919). *Old South Ass'n* v. *Boston*, 212 Mass. 299, 304-305 (1912). "The plain meaning of a statute cannot be affected by resort to proceedings incident to its passage. Light may be sought from that source only to illumine statutory language of doubtful import. Other information than that afforded by the words of the statute can be examined only to aid in the solution of an ambiguity. We can only interpret the words of the statute: we cannot speculate as to the probable intention of the Legislature apart from those words." *Allen* v. *Commissioner of Corps. & Taxation*, 272 Mass. 502, 508 (1930).

The case of *D.N. Kelley & Son* v. *Selectmen of Fairhaven*, 294 Mass. 570 (1936), involved the question whether the selectmen were authorized by St. 1926, c. 43, § 1, to give a lease of a town wharf. *Id.* at 571, 574. The plaintiff offered, and the trial judge excluded, evidence that as originally presented to the Governor for signature the bill expressly authorized the selectmen to "lease said property in whole or in part for any purpose," that the Governor returned it with his recommendation that those words be struck out, and that the bill after having been thus amended was enacted and became a law. *Id.* at 576. The law as enacted said that the selectmen could acquire Union Wharf in their town and that they could "maintain and operate the same as a wharf." *Id.* at 571. This court, in upholding the exclusion of the proffered evidence, said: "The words of the statute as enacted are plain and need no elucidation as to their meaning. The leasing shown by the record and assailed in this proceeding was merely incidental to the main purpose for which the wharf was acquired and in no way has interfered with that purpose." *Id.* at 576 (citation omitted).

In *Milton* v. *Metropolitan Dist. Comm'n*, 342 Mass. 222, 223 (1961), we said: "There is no need to resort to the legislative history of [the statute involved], because its words are

unequivocal. Indeed, because of its clarity we should not interpret it by resorting to its legislative history." Accord, *Nichols* v. *Commissioner of Corps. & Taxation*, 314 Mass. 285, 293 (1943); *Boston Consol. Gas Co.* v. *Department of Pub. Utils.*, 321 Mass. 259, 266 (1947).

Since it is my opinion, as already stated above, that the language of § 16A, and particularly the words "at the trial" as used therein, are not ambiguous, I believe that under the doctrine developed in the cases discussed above, nothing in the legislative history can justify a departure from the plain meaning of these words.

In its opinion the court seems to emphasize that the Special Commission which recommended the amendment of § 16A in the manner later enacted as St. 1931, c. 205, said in its report (1931 House Doc. No. 1200, at 90) that the statutory purpose was: "To spare girls of juvenile age the embarrassment, humiliation and demoralization of testifying to all the sordid details of rape, incest, carnal abuse or other crime involving sex, incidental to open trial with examination and cross-examination." At the risk of repetition, it is my view that such emphasis and reliance on the report would be proper if we were dealing with ambiguous statutory language, which I do not believe to be the case. The Legislature apparently chose language which was broader than that which would have been necessary to accomplish the more limited objective of the Commission. In these circumstances the intention of the Special Commission cannot prevail over the clear and unequivocal, albeit broader, language used by the Legislature in § 16A.

3. If this were a case where, by reason of ambiguous statutory language, we were permitted to resort to extrinsic aids for the interpretation of that language, I would prefer to resort to the aid sanctioned in *Burrage* v. *County of Bristol*, 210 Mass. 299 (1911). That case involved the question whether a statute which authorized "the expenses and costs" of disbarment proceedings meant that such sums were to be paid "as in criminal prosecutions." *Id.* at 300. This court said, *id.* at 301: "It is agreed that the practice has been for

many years for the counties to pay for professional services rendered in prosecuting disbarment proceedings. Where the language of a statute is of doubtful import, the contemporaneous construction put upon it by officers thereby charged with performance of public duties is strong evidence of its meaning. The understanding and application of statutory words susceptible of different meanings, through years of practice, and sanctioned by the acquiescence of the Legislature, is significant of the intention with which they were employed originally." [1]

The case of *Swan* v. *Superior Court,* 222 Mass. 542 (1916), involved the removal of members of a licensing board under R. L. c. 100, § 4, which provided that such removals were subject to review by the Superior Court and that "there shall be no appeal" from the decision of the court. *Id.* at 543. The issue was whether, notwithstanding the quoted language, the decision could be reviewed under a petition for a writ of certiorari, as had been done for many years, pursuant to R. L. c. 156, § 3, and R. L. c. 192, § 4, authorizing this court "to correct and prevent errors and abuses [in proceedings of trial courts] if no other remedy is expressly provided." In holding that the latter statutes prevailed, this court noted that the Superior Court had universally followed a practice in accord with those statutes, and said, "The understanding and application of statutory words through years of practice by those charged with heavy official responsibility to interpret them aright, sanctioned by the acquiescence of the Legislature, is persuasive, although not conclusive, as to their correct meaning." *Id.* at 547.

---

[1] In many other cases involving the construction of a statute, this court has used, as an extrinsic aid, the construction given to that statute over a period of years by an administrative agency charged with the enforcement or administration of the statute, sometimes citing the *Burrage* case, *supra,* in support of that practice. See, e.g., *Cleary* v. *Cardullo's Inc.,* 347 Mass. 337, 343-344 (1964); *Mullen* v. *Sewer Comm'rs,* 280 Mass. 531, 536 (1932); *Allen* v. *Commissioner of Corps. & Taxation,* 272 Mass. 502, 509 (1930); *United States Trust Co.* v. *Commonwealth,* 245 Mass. 75, 80 (1923); *Tyler* v. *Treasurer & Receiver Gen.,* 226 Mass. 306, 310 (1917).

If we were to resort to extrinsic aids for the interpretation of G. L. c. 278, § 16A, on the assumption that its language is ambiguous, I believe that the aid illustrated in the *Burrage* and *Swan* cases, *supra*, would support the conclusion that § 16A is not to be interpreted as narrowly as is done in this court's opinion in the present case. The court holds today that, since 1931, § 16A became mandatory by reason of the amendment[2] substituting the mandatory word "shall" for the directory word "may." I believe it is proper for us to take judicial notice of the fact that almost all Superior Court judges who have had occasion to apply the statute since 1931 have proceeded on the basis that it required closure of the entire trial. I know of no instance in which a judge who made a more limited application of § 16A did so on the basis of the interpretation this day given to it by this court.

I believe that it is also proper to take notice (a) that in the past several years there has been an increase in aggressive, and perhaps concerted, action by the press in claiming a constitutional right to be present at trials which are subject to § 16A; and (b) that some judges of the Superior Court, but very few, have either yielded to or attempted to accommodate that pressure by admitting the press under special conditions, guidelines or restraints. See *Commonwealth* v. *Leo, ante* 34, 36-38, (1979). Whatever the motivation or reason for this departure from the previous universal application of § 16A to the entire trial, there is no indication that it was due to any concept that the Legislature had intended the closure to be limited to the time when the youthful victim testified. Indeed, the departure as applied in the *Leo* case, *supra*, did not take the form of the closure of a particular part of the trial. If the departure was due to constitutional considerations, it does not detract from the significance of the fact that for almost fifty years the judges of the Superior Court have treated § 16A as applying to the entire trial. That fact, while not conclusive, is in my opinion per-

---

[2] St. 1931, c. 205.

suasive against the limitation which this court now places on the statute.

4. Although the court does not decide the constitutional issues raised by the plaintiff, their presence is a factor in the limitation which it places on § 16A. The court expressly notes the presence of these issues and says that in view thereof, and of "the United States Supreme Court's uncertain posture on the issues, [citing the *Richmond Newspapers, Inc.*, and the *Gannett Co.* cases] we seek to shrink the region of possible constitutional doubts about G. L. c. 278, § 16A." It does this in the application of the principle that a "statute must be construed, if fairly possible so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score."

The *Richmond Newspapers, Inc.*, case has now been argued before the United States Supreme Court. In my opinion if the decision in that case or any other decision hereafter by a court enjoying supremacy in this area mandates the truncation of G. L. c. 278, § 16A, so that it applies only to the time when the minor victim testifies, there will be time enough for this court so to limit it. On the other hand, if it becomes apparent from future controlling decisions that the truncation now declared by this court was not constitutionally required, the present holding probably cannot effectively be reversed except by new legislation.

Until there is a controlling decision on this subject by the United States Supreme Court, I do not believe that the concern expressed and protection provided by the Legislature for minor victims of sex crimes by the language of G. L. c. 278, § 16A, should be stripped from them by judicial action. The mere specter of a decision yet to be issued by the United States Supreme Court should not be a factor contributing to judicial retreat and discontinued enforcement of the legislative mandate contained in § 16A.